#27691-a-LSW
**2017 S.D. 10**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                                    Plaintiff and Appellee,

     v.

DANIEL NEIL CHARLES a/k/a
DANIEL HEINZELMAN a/k/a
DANIEL INGALLS,                                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
MEADE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JEROME A. ECKRICH, III
Judge

* * * *

MARTY J. JACKLEY
Attorney General

ANN C. MEYER
Assistant Attorney General
ROBERT MAYER
Deputy Attorney General
Pierre, South Dakota                                    Attorneys for plaintiff
                                       and appellee.

ALICIA A. D'ADDARIO
BRYAN A. STEVENSON
JOHN W. DALTON of
Equal Justice Initiative
Montgomery, Alabama

     and

BRAD SCHRIEBER of
Schreiber Law Office
Pierre, South Dakota

     and

ROBERT VAN NORMAN
Rapid City, South Dakota                                Attorneys for defendant
                                       and appellant.

* * * *

ARGUED ON
JANUARY 10, 2017
OPINION FILED **03/29/17**

#27691

WILBUR, Justice

[¶1.]		In 2000, Daniel Charles received a mandatory sentence of life in prison for first-degree murder. Charles was 14 years old when he committed the offense. In 2012, the United States Supreme Court issued *Miller v. Alabama*, which barred mandatory life sentences against juvenile homicide offenders. 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). Charles filed a motion to have his sentence corrected, and the court held a hearing. In 2015, the sentencing court resentenced Charles to 92 years in prison. Charles appeals. We affirm.

## Background

[¶2.]		On April 17, 2000, a jury found Charles guilty of the 1999 murder of Duane Ingalls, Charles's stepfather. Charles was 14 years old when he shot and murdered Ingalls. The sentencing court sentenced Charles to a mandatory sentence of life in prison. This Court affirmed Charles's conviction in *State v. Charles*, 2001 S.D. 67, 628 N.W.2d 734. In May 2011, Charles filed a motion in circuit court to correct an illegal sentence. He alleged that his sentence violated the Eighth Amendment prohibition against cruel and unusual punishment. In January 2015, the circuit court granted Charles's motion because the United States Supreme Court declared unconstitutional mandatory life-without-parole sentences for juvenile homicide offenders. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469.

[¶3.]		The sentencing court held a resentencing hearing on October 21-23, 2015. The same judge who had presided over Charles's 2000 trial also presided over Charles's resentencing. At the hearing, both the State and Charles presented evidence concerning Charles's childhood and the impact of that childhood on the

-1-

nature of the crime. The State and Charles presented expert testimony related to Charles's emotional, social, psychological, and intellectual attributes as a juvenile offender and to his changed, matured character as an adult. Charles presented expert testimony that his behavior in prison for the past 16 years showed that Charles could live a meaningful and productive life outside prison. At the conclusion of the resentencing hearing, the court allowed oral victim-impact statements. The court recognized that one person making a statement—Ingalls's cousin—did not fit within the statutory definition of "victim" under SDCL 23A-27-1.1. The court allowed the cousin's oral statement over Charles's objection.

[¶4.]        On October 30, 2015, the court orally sentenced Charles to 92 years in prison. The court recognized that:

> *Miller vs. Alabama* refines the [c]ourt's responsibility when determining an appropriate sentence for a juvenile killer. As [Charles's] prehearing sentencing memorandum notes, relevant, mitigating factors of youth include: Lack of maturity, an underdeveloped sense of responsibility, which implies the tendency to engage in behavior that is reckless, impulsive, or risky.
>
> The *Miller* Court identified vulnerability to negative influences, outside pressures coupled with limited control over environment, and an inability to extricate oneself from horrific, crime-producing circumstances.
>
> *Miller* observed that a child's character is not as well-formed as an adult's. Consequently, a juvenile's actions are less-likely to evidence irretrievable depravity. These characteristics diminish the penological justifications of a sentence: Retribution, deterrence, and incapacitation.
>
> Finally, *Miller* says, "Life without parole foreswears the rehabilitative ideal and requires that an offender" - - "requires a finding that an offender is incorrigible which is at odds with the child's capacity for change."

[¶5.]    The court remarked that it accepted the principles of *Miller* "in general to youth." The court, however, did not find the characteristics of youth "universally applicable to each and every juvenile, whether that juvenile is a murderer or a prodigy." The court concluded that the general characteristics of youth did not cause Charles to pull the trigger. The court also did not believe that Charles's murder of Ingalls was "inexorably determined by youthful brain or undeveloped character." The court said, "To find otherwise, denies the existence of will." In the court's view, Charles was not a "child of tender years when he murdered his father[.]" The court identified that "an objective observer, giving Daniel Charles all the characteristics of youth, and even giving Daniel Charles - - giving credence to Daniel Charles' latest version of the events can yet conclude this was a cold-blooded murder, driven less by impulsivity than by a specific, long-formed intent to murder either Duane or his mother or others."

[¶6.]    The court recalled evidence from Charles's juvenile transfer hearing. At the hearing, Dr. Steven Manlove, who had completed a psychiatric examination of Charles, opined that Charles's murder of Ingalls was not an impulsive event. Rather, Charles exhibited chronic problems with manipulation, explosive anger, conduct disorder, and antisocial traits. The sentencing court noted that "after hearing all of the psychological experts, [it] cannot ignore the chronicity of those problems identified over 16 years ago." The court found that, in regard to Charles, "those traits observed in his childhood continue into adulthood."

[¶7.]    The court stated the goals of sentencing in general and noted that even if it assumed *Miller* stood for the proposition that the "rehabilitation ideal for a

juvenile offender is preeminent over all the other goals of sentencing," the court "must consider all the pertinent goals of sentencing." The gravity of the offense, according to the court, "is great, notwithstanding any lessened moral culpability associated with mitigating qualities of youth." Based on the evidence, the court concluded that "[s]ociety's not yet safe for Mr. Charles." The court highlighted that by Charles's "own admission, he has demonstrated the capacity for past and continuing violence in and out of prison." The court found incapacitation "a continuing factor of import." The court sentenced Charles to 92 years, "notwithstanding Daniel Charles' chronological age at the time" because "[s]ociety requires that a crime of this gravity under the circumstances presented . . . demands substantial retribution." The court granted Charles credit for the 16 years he had already served.

[¶8.]     Charles appeals, and we reorder the issues as follows:

1. Whether a 92-year sentence is categorically unconstitutional for a 14-year-old child?

2. Whether a sentence of 92 years is the legal equivalent of a sentence of life without parole?

3. Whether the sentencing court erred because it disregarded the mitigating qualities of youth set forth in *Miller v. Alabama* and other factors?

4. Whether a 92-year sentence is grossly disproportionate to the gravity of the offense?

5. Whether the sentencing court erred when it permitted an oral victim-impact statement by an individual outside the statutory definition of a victim?

## Analysis

### 1. Whether a 92-year sentence is categorically unconstitutional for a 14-year-old child?

[¶9.] Charles begins this issue by stating, "The constitution categorically prohibits sentencing a 14-year-old child to die in prison." We disagree. The United States Supreme Court categorically barred the death penalty for juvenile offenders. *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). But the Supreme Court has not held that the Eighth Amendment prohibits a sentence of life in prison without the possibility of parole for a juvenile homicide offender. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469. Nor has the Supreme Court barred discretionary sentences to a lengthy term of years. Therefore, we do not find Charles's 92-year sentence categorically unconstitutional.

[¶10.] Nonetheless, Charles also contends that his 92-year sentence is categorically unconstitutional because early adolescents are developmentally distinct from older adolescents. He argues that "14-year-olds universally fall into the category of 'juvenile offenders whose crimes reflect the transient immaturity of youth,' and for whom a death-in-prison sentence would be unconstitutional." Charles was not sentenced to death. And Charles cites no case in which the United States Supreme Court or this Court has held that a defendant sentenced to a discretionary term of years with a possibility of parole at 60 years old is per se unconstitutional just because the offender was 14 years old at the time of the offense. We decline to hold that a discretionary, 92-year sentence standing alone is categorically unconstitutional against a 14-year-old offender. *See United States v. Jefferson*, 816 F.3d 1016, 1019 (8th Cir. 2016) (declining to hold that a 600-month

sentence falls within *Miller's* categorical ban on mandatory life sentences), *petition for cert. docketed*, No. 16-6725 (U.S. Nov. 4, 2016).

### 2. Whether a sentence of 92 years is the legal equivalent of a sentence of life without parole?

[¶11.] Charles argues that his 92-year sentence is equivalent to a sentence of life without parole because he will be 106 years old before he completes his entire sentence. Charles acknowledges that he is eligible for parole at age 60. But he claims that release at age 60 is a geriatric release and the functional equivalent of life without parole in violation of the Eighth Amendment. He also argues that such release violates the principles in *Graham*, *Miller*, and *Montgomery* because release at age 60 provides only grim prospects for any meaningful future outside prison.

[¶12.] Even if Charles's 92-year sentence is equivalent to a sentence of life without parole, that alone does not mean his sentence is unconstitutional under Eighth Amendment precedent. The United States Supreme Court bars *mandatory* life sentences without parole against juvenile homicide offenders, not *discretionary* sentences of life without parole. *See Miller*, 567 U.S. at ___, 132 S. Ct. at 2469; *State v. Springer*, 2014 S.D. 80, ¶ 15, 856 N.W.2d 460, 466 (recognizing that "[n]either *Graham* nor *Miller* explicitly . . . apply to the functional equivalent of life without parole (i.e. 'de facto' life sentences)").

[¶13.] In response, Charles asks this Court to subscribe to the view adopted by other courts and hold that "lengthy term-of-year sentences violate the Eighth Amendment when imposed on a juvenile." We recently examined a similar argument in *Springer*. 2014 S.D. 80, ¶¶ 20-22, 856 N.W.2d at 468-69. Springer received a 216-year sentence with parole eligibility at age 49. Springer argued that

he received a sentence equivalent to a sentence of life without parole in violation of *Miller* and *Graham*. He directed this Court to cases from other jurisdictions, namely *People v. Caballero*, 282 P.3d 291 (Cal. 2012), and *State v. Ragland*, 836 N.W.2d 107 (Iowa 2013). After recognizing a split of authority on whether *Miller* extends to de facto life sentences and discretionary life sentences without the possibility of parole, we "decline[d] the invitation to join jurisdictions holding *Roper*, *Graham*, and *Miller* applicable or inapplicable to de facto life sentences." *Springer*, 2014 S.D. 80, ¶ 25, 856 N.W.2d at 470. We said, "Springer's parole eligibility at age 49 prevents us from concluding that he received a de facto life sentence." *Id.* ¶ 25 n.8. Similarly, here, we decline to hold that Charles's 92-year sentence with a possibility of parole at age 60 is a de facto life sentence.

[¶14.]     Yet Charles also claims that his 92-year sentence with a possibility of parole at age 60 fails to provide a *meaningful* opportunity for release. He argues that under the Eighth Amendment, a meaningful opportunity for release requires that a juvenile defendant have an "opportunity to truly reenter society" and have a "meaningful life outside of prison." *See Casiano v. Comm'r of Correction*, 115 A.3d 1031, 1047 (Conn. 2015). Charles also highlights that the United States Sentencing Commission equates a 470-month sentence (39.17 years) to a life sentence, which, to Charles, supports that a sentence to a lengthy term of years fails to provide a meaningful opportunity for release.

[¶15.]     In *Springer*, we examined the effect of the phrase "meaningful opportunity for release[.]" 2014 S.D. 80, ¶ 23, 856 N.W.2d at 469. Springer had argued that parole at age 49 does not comport with the requirement in *Graham* that

a juvenile offender have a *meaningful* opportunity to obtain release. *Id.* (citing *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030). We noted that under *Graham*, the United States Supreme Court said that juvenile offenders must have a "*meaningful opportunity* to obtain release based on demonstrated maturity and rehabilitation." *Id.* (quoting 560 U.S. at 75, 130 S. Ct. at 2030) (emphasis added)). We interpreted this phrase to mean that the offender have a "realistic" opportunity. *Id.* "A State *need not guarantee the offender eventual release*, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term." *Id.* (quoting *Graham*, 560 U.S. at 82, 130 S. Ct. at 2034) (emphasis added). We concluded that Springer had a meaningful opportunity for release because he had the opportunity for parole at age 49 and presented no evidence that his opportunity for release was unrealistic. *Id.* ¶ 24. More recently, we concluded that an 80-year sentence for a juvenile homicide offender with an opportunity for release at age 55 did not constitute a de facto life sentence. *State v. Diaz*, 2016 S.D. 78, ¶ 58, 887 N.W.2d 751, 768.

[¶16.] "A life sentence is commonly understood to mean spending the rest of one's life in prison." *Boneshirt v. United States*, No. CIV 13-3008-RAL, 2014 W.L. 6605613, at *8 (D.S.D. Nov. 19, 2014) (citing Black's Law Dictionary 1485 (9th ed. 2009)). This is not to say that a sentence to a term of years for a juvenile homicide offender will always pass constitutional muster. For example, "term sentences virtually guaranteeing an offender will die in prison without meaningful opportunity for release could be considered a life sentence for the purpose of applying *Graham* or *Miller*." *Id.* at *8-9 (opportunity for release at age 65 is not a

de facto life sentence). Because Charles has the opportunity for release at age 60, his sentence does not "guarantee[] he will die in prison without any meaningful opportunity to obtain release." *See Graham*, 560 U.S. at 79, 130 S. Ct. at 2033; *accord Springer,* 2014 S.D. 80, ¶ 25, 856 N.W.2d at 70.

> ### 3. Whether the sentencing court erred because it disregarded the mitigating qualities of youth set forth in *Miller v. Alabama* and other factors?

[¶17.] Charles argues that the sentencing court failed to consider the mitigating qualities of youth because the court "briefly listed the *Miller* factors" and recognized the factors only "in general to youth." Charles contends that the sentencing court had no discretion to conclude that the mitigating factors of youth did not apply to Charles because the evidence diminished the penological justifications for Charles's harsh sentence. According to Charles, the court inappropriately focused on the incapacitation goal of sentencing and clearly erred when it concluded that Charles demonstrated "continuing violence in and out of prison." Charles emphasizes that his rehabilitation is "actively ongoing." He "has matured significantly and engaged in programming to further himself while in prison" and has spent over half of his life in prison with a record devoid of violence.

[¶18.] A sentencing court has broad discretion when fashioning an appropriate sentence. The court must "acquire a thorough acquaintance with the character and history of the [person] before it." *State v. Lemley*, 1996 S.D. 91, ¶ 12, 552 N.W.2d 409, 412 (quoting *State v. Chase in Winter*, 534 N.W.2d 350, 354 (S.D. 1995)). "This includes the circumstances of the offense 'together with the character and propensities of the offender.'" *State v. Anderson*, 1996 S.D. 46, ¶ 32, 546

N.W.2d 395, 403 (quoting *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S. Ct. 2909, 2932, 49 L. Ed. 2d 859 (1976)).

[¶19.] Although *Miller* did not categorically bar discretionary life sentences or de facto life sentences against juvenile offenders, *Miller* made clear "that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children." 567 U.S. at ___, 132 S. Ct. at 2466. "Sentencing courts must consider what the United States Supreme Court termed the 'mitigating qualities of youth.'" *Springer*, 2014 S.D. 80, ¶ 14, 856 N.W.2d at 465 (quoting *Miller*, 567 U.S. at ____, 132 S. Ct. at 2467); *accord Jefferson*, 816 F.3d at 1019-20. Those qualities include:

> (1) the chronological age of the juvenile, (2) the juvenile's immaturity, impetuosity, irresponsibility, and recklessness, (3) family and home environment, (4) incompetency in dealing with law enforcement and the adult criminal justice system, (5) the circumstances of the crime, and, most importantly, (6) the possibility for rehabilitation.

*Springer*, 2014 S.D. 80, ¶ 14, 856 N.W.2d at 465-66 (citing *Miller*, 567 U.S. at ____, 132 S. Ct. at 2467-69).

[¶20.] From our review, the record does not support Charles's claim that the sentencing court ignored "the distinctive attributes of youth" when sentencing Charles. The two-day resentencing hearing focused largely on the applicability of the *Miller* factors in Charles's case, and the court's oral sentence reflects the court's understanding and evaluation of those factors. The court listened to multiple expert witnesses describe Charles's youth-related characteristics in connection with the commission of the crime and Charles's prospects for rehabilitation. These experts based their opinions on, among other things, hours of interview time with

Charles and on their review of the extensive evidence from the 2000 trial. The court also weighed Charles's status as a juvenile offender in reference to the court's memory and knowledge of Charles's character from the proceedings surrounding the 2000 trial and the evidence submitted at that trial.

[¶21.]       Nonetheless, Charles argues that the sentencing court violated the requirements of *Miller* because the court's reasoning is clearly erroneous. Charles argues that both the State and defense experts agreed that at the time of the offense, Charles was more vulnerable and immature than the average 14 year old. He also claims that the uncontroverted evidence established that Charles would not be a danger to society. He claims that both the State and defense witnesses agreed that Charles's home environment in South Dakota was dysfunctional and included domestic violence and abuse. In Charles's view, therefore, a 35-year sentence or a sentence that would have provided an opportunity for release after 20 or 30 years would comport with the requirements of *Miller*. A sentence of 35 years would mean Charles would be released on probation after serving 17.5 years. When the sentencing court issued its second amended judgment of conviction resentencing Charles, Charles had served 16 years and three months.

[¶22.]       From our review of the evidence and the court's oral ruling, the court applied the law in *Miller* to Charles in particular before it imposed a harsh penalty. The court specifically acknowledged "the lessened moral culpability associated with the mitigating qualities of youth," but gave more weight to its finding that Charles "still presents a condition of moral atrophy[.]" The court identified, and the evidence supports, that Charles acknowledged that "he continues to manipulate,"

"explodes in anger if his buttons are pushed," and has "only recently stopped lying." The court also gave weight to the gravity of the offense, finding it to be a "premeditated, deliberate, intentional, sniper killing."

[¶23.] The circuit court believed that "rehabilitation is, if anything, only in its nascence." Charles's "lifelong history of lying" concerned the court such that the court found it "impossible to engage the sincerity of Daniel Charles' remorse or expressions of changed behavior." We note again that the sentencing judge is the same judge who presided over Charles's murder trial. The court also "seriously" questioned Charles's "rendition of the relationship between he and [the victim]." The court did "not accept wholesale Daniel Charles' description of the pervasive, knock-down, drag-out, physical combat he describes between father and son." These are credibility determinations for the court. The court indicated, however, that even if it accepted the abuse as described, "by no stretch of the imagination can a relationship between the father and son be described as a horrific, crime-producing setting."

[¶24.] Because the court's oral sentence reflects the court's understanding and evaluation of the *Miller* factors and because the court sentenced Charles after acquiring a thorough acquaintance with Charles's history and character, we conclude that the court did not abuse its discretion or violate the requirements of *Miller*.

### 4. Whether a 92-year sentence is grossly disproportionate to the gravity of the offense?

[¶25.] Charles argues that his sentence is grossly disproportionate in violation of the Eighth Amendment because the evidence presented at the

resentencing hearing established that Charles's "crime reflects transient immaturity." Charles emphasizes the mitigating evidence presented at the resentencing hearing and the vulnerabilities associated with being a 14-year-old offender. He also directs this Court to other cases in South Dakota in which juvenile offenders were sentenced less severely, "further illustrating that the sentence is disproportionate."

[¶26.] Charles acknowledges that this Court determines whether a sentence is grossly disproportionate in violation of the Eighth Amendment by comparing the gravity of the offense against the harshness of the penalty as most recently explained in *State v. Chipps*, 2016 S.D. 8, 874 N.W.2d 475, and *State v. Rice*, 2016 S.D. 18, ¶ 17, 877 N.W.2d 75, 81. But, according to Charles, *Chipps* and *Rice* do not apply when reviewing the proportionality of a juvenile sentence under the Eighth Amendment; *Roper*, *Graham*, *Miller*, and *Montgomery* control.

[¶27.] In *Roper*, *Graham*, and *Miller*, the United States Supreme Court held that the Eighth Amendment prohibits certain sentences for juvenile offenders regardless of the juvenile's character or the circumstances of the crime. *Roper*, 543 U.S. 551, 125 S. Ct. 1183 (barring the imposition of the death penalty); *Graham*, 560 U.S. 48, 130 S. Ct. 2011 (banning life sentences without parole against nonhomicide juvenile offenders); *Miller*, 567 U.S. at ___, 132 S. Ct. 2455 (banning sentencing schemes that impose mandatory life sentences against juvenile homicide offenders). *Montgomery* declared that *Miller* applies retroactively. *Montgomery v. Louisiana*, ___ U.S. ___, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016). In no case, however, has the United States Supreme Court identified a different proportionality

standard under the Eighth Amendment when a juvenile defendant asserts a disproportionality claim based on *the character of the juvenile* and *the circumstances of the crime*. So to address Charles's disproportionality claim, we apply this Court's and the United States Supreme Court's Eighth Amendment precedent.

[¶28.]     Under the Eighth Amendment to the United States Constitution, "a criminal sentence must be proportionate to the crime for which the defendant has been convicted." *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009, 77 L. Ed. 2d 637 (1983). This does not mean "strict proportionality between crime and sentence." *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment). The Eighth Amendment "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Id.* If an appearance of gross disproportionality results after the initial comparison, only then will we compare a defendant's sentence to those imposed on other criminals in the jurisdiction. *Chipps*, 2016 S.D. 8, ¶¶ 34, 38, 874 N.W.2d at 487, 489. "In conducting the threshold comparison between the crime and the sentence, we also consider other conduct relevant to the crime." *State v. Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d 771, 776. We, however, do not consider a disparity between Charles's sentence and other criminals unless Charles's sentence appears grossly disproportionate. *See Rice*, 2016 S.D. 18, ¶ 17, 877 N.W.2d at 81. Similarly, we do not review the weight the sentencing court gave to mitigating factors or to the history and characteristics of Charles in particular. *See id.* ¶ 18.

[¶29.] "[T]he gravity of the offense refers to the offense's relative position on the spectrum of all criminality." *Chipps*, 2016 S.D. 8, ¶ 35, 874 N.W.2d at 487. The harshness of the penalty looks "to the penalty's relative position on the spectrum of all permitted punishments." *Id.* ¶ 37. Because "neither a sentence of death nor a sentence of mandatory life is a permitted punishment against a juvenile, . . . the spectrum of permitted punishments does not include or end at death as it would in our review of an adult sentence under the Eighth Amendment." *Diaz*, 2016 S.D. 78, ¶ 54, 887 N.W.2d at 767. The harshest penalty a juvenile offender could receive for this State's most severe crime is "a term of years in the state penitentiary, and a fine of fifty thousand dollars[.]" SDCL 22-6-1. When a defendant receives a sentence to a term of years, the comparison for purposes of proportionality is "one of line-drawing." *Helm*, 463 U.S. at 294, 103 S. Ct. at 3012. "[T]he question is one of degree—e.g., 'it is clear that a 25-year sentence generally is more severe than a 15-year sentence[.]'" *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488 (quoting *Helm*, 463 U.S. at 294, 103 S. Ct. at 3012). In judging the harshness of the penalty, we also consider the possibility of parole. *Id.*

[¶30.] A jury convicted Charles of first-degree murder. Murder is "'the highest crime against the law of nature, that man is capable of committing.'" *Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d at 80 (quoting 4 William Blackstone, *Commentaries* *177-78). The murder in this case involved, as the court noted, a "premeditated, deliberate, intentional, sniper killing." On the relative spectrum of criminality, Charles's crime is on the high end. The court sentenced Charles to 92 years in prison. He will be eligible for parole when he is 60 years old. The penalty sits on

the harsher end of the spectrum. But our comparison of the gravity of the offense against the harshness of the penalty does not lead to an inference of gross disproportionality; therefore, our review ends. *See Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d at 489.

### 5. Whether the sentencing court erred when it permitted an oral victim-impact statement by an individual outside the statutory definition of a victim?

[¶31.] Although we review a court's evidentiary rulings for an abuse of discretion, the question whether a court misapplied a rule of evidence is reviewed de novo. *See State v. Packed*, 2007 S.D. 75, ¶ 24, 736 N.W.2d 851, 859. Under SDCL 19-19-402, -403, evidence is generally admissible so long as it is relevant and not unfairly prejudicial. SDCL 23A-27-1.1 provides that "the victim has the right to orally address the court concerning the emotional, physical, and monetary impact of the defendant's crime upon the victim and the victim's family, and may comment upon the sentence which may be imposed upon the defendant." A victim is defined as "the actual victim or the parent, spouse, next of kin, legal or physical custodian, guardian, foster parent, case worker, victim advocate, or mental health counselor of any actual victim who is incompetent by reason of age or physical condition, who is deceased, or whom the court finds otherwise unable to comment." *Id.*

[¶32.] During Charles's hearing, the sentencing court allowed Kari Jensen Thomas to make an oral victim-impact statement. The court identified that Thomas was Ingalls's cousin and, therefore, not within the definition of a "victim" under SDCL 23A-27-1.1. The court overruled Charles's objection to her statement, ruling that it would grant the State's request. Charles argues that by ignoring the

dictates of SDCL 23A-27-1.1, the court violated his constitutional right to a fair trial. He claims he was prejudiced by Thomas's oral statement because it was "highly inflammatory." Thomas stated she was speaking on behalf of "close to 100 Ingalls and Jensen family members" and recounted the continued fear the family members experience about Charles being released. In response, the State claims that the sentencing court's departure from the statute was justified as a "practical solution" to reduce the disappointment for those family members unable to speak in court. The State also contends that the court did not violate the spirit and intent of SDCL 23A-27-1.1.

[¶33.]     Victim-impact evidence related to the defendant's personal characteristics was, until 1991, per se inadmissible during the penalty phase of a capital trial. *Payne v. Tennesee*, 501 U.S. 808, 818, 111 S. Ct. 2597, 2604, 115 L. Ed. 2d 720 (1991). In *Payne*, however, the United States Supreme Court rejected this prohibition, concluding that "the assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law . . . in determining the appropriate punishment." *Id.* at 819, 111 S. Ct. at 2605. The Court also considered that "the sentencing authority has always been free to consider a wide range of relevant material." *Id.* at 820-21, 111 S. Ct. at 2606. Therefore, the Supreme Court left the issue to the states—"if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar." *Id.* at 827, 111 S. Ct. at 2609.

[¶34.] Charles is correct that the definition of a victim in SDCL 23A-27-1.1 does not include a cousin of the actual victim. But nothing in SDCL 23A-27-1.1 limits a sentencing court's "wide discretion with respect to the type of information used as well as its source." *See State v. McCrary*, 2004 S.D. 18, ¶ 29, 676 N.W.2d 116, 125 (quoting *State v. Arabie*, 2003 S.D. 57, ¶ 21, 663 N.W.2d 250, 257). Moreover, even if the court improperly admitted Ingalls's cousin's statement, an improperly-admitted victim impact statement will not "rise to the level of a constitutional deprivation" unless the statement is "so unduly prejudicial that it renders the trial fundamentally unfair." *State v. Berget*, 2013 S.D. 1, ¶ 83, 826 N.W.2d 1, 26 (quoting *Payne*, 501 U.S. at 825, 111 S. Ct. at 2608); *People v. Willis*, 569 N.E.2d 113, 117 (Ill. App. Ct. 1991) ("Any error in the presentation of this statement, however, was harmless, particularly since the statement was presented to a judge, rather than to a jury.").

[¶35.] In addition to Thomas's oral statement, Ingalls's sister spoke. She, like Thomas, shared concerns on behalf of the entire Ingalls and Jensen families. She, like Thomas, recounted the gruesome details of the crime. Ingalls's sister explained how Charles's crime impacted particular family members and emphasized the fear that every family member continues to experience with the thought of Charles being released. The record also contains many written letters stating the same sentiments. Because of Ingalls's sister's oral statement and the letters, the admission of Thomas's oral statement was not so prejudicial that it deprived Charles of a constitutional right.

[¶36.] Affirmed.

#27691

[¶37.] GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and KERN, Justices, concur.

-19-