#28608-a-MES
**2020 S.D. 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

CARLOS C. QUEVEDO,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE HEIDI L. LINNGREN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

ANN C. MEYER
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff
                                  and appellee.


PAUL EISENBRAUN of
Grey & Eisenbraun Law
Rapid City, South Dakota                    Attorneys for defendant
                                  and appellant.

* * * *

ARGUED
OCTOBER 1, 2019
OPINION FILED **07/22/20**

#28608

SALTER, Justice

[¶1.]     Carlos Quevedo pled guilty to second-degree murder in the stabbing death of Kasie Lord.  He was 17 years old when he committed the crime.  The circuit court sentenced him to 90 years in prison, making him eligible for parole at age 62.  Quevedo appeals, claiming his sentence is unconstitutional because it violates categorical limitations placed upon sentences for juveniles and because it is disproportionately harsh.  We affirm.

## Background

[¶2.]     Carlos Quevedo spent the evening of January 17, 2017, ingesting cold medicine, alcohol, and marijuana with his friends in Rapid City.  Quevedo and his friends also stole food and alcohol from two local convenience stores and went through unlocked cars looking for items to steal.  Quevedo's friend, Cody Grady, found a knife in one of the cars, but Quevedo took it from him because he thought Grady was too intoxicated to carry a weapon.

[¶3.]     As the evening progressed into the early morning hours of January 18, Quevedo and Grady decided to steal beer from another local convenience store.  The store's surveillance video shows Quevedo and Grady walking into the store and the events that followed.  Grady's first attempt to steal a case of beer was thwarted by the store's clerk, Kasie Lord, who took the case of beer away from him and placed it behind the counter.  Grady then went back and grabbed another case of beer.  Lord positioned herself in front of the door and called 911.  As she began to struggle with Grady to recover the second case of beer, Quevedo started stabbing Lord in the back with the stolen knife.  Lord can be heard on the 911 call asking Quevedo, "What are

-1-

you doing? Are you stabbing me?" Lord then tells him to "Stop it! You've got the beer!" and begins screaming as Quevedo stabs her. Quevedo can be heard saying, "Shut the fuck up, bitch."

[¶4.] Freed from Lord's efforts to intervene, Grady ran from the store with the opened case of beer, dropping cans as he ran. However, Quevedo did not leave. He followed Lord into the parking lot and continued his attack, stabbing her repeatedly before fleeing on foot. Quevedo went to Grady's home, located within one block of the convenience store, where he changed out of the distinctive sweatshirt he wore during the killing and hid it above some drop ceiling tiles.

[¶5.] Law enforcement officers arrived at the convenience store shortly after the stabbing and found Lord lying in the parking lot surrounded by a pool of blood. They noted numerous stab wounds to her chest, abdomen, and back with little to no active bleeding. An ambulance arrived and transported her to the hospital where she later died. Lord's autopsy revealed 38 stab wounds in addition to defensive wounds on her hands.

[¶6.] The officers reviewed the store's surveillance video and followed a trail of loose beer cans and bloody shoe imprints to Grady's home where they apprehended both Quevedo and Grady. Quevedo told the officers that he had blacked out and had no memory of stabbing Lord.

[¶7.] A grand jury indicted Quevedo on alternate counts of first-degree premeditated murder, first-degree felony murder, and second-degree murder, along with first-degree robbery. Quevedo initially moved to have the case transferred to juvenile court, but later withdrew the motion and accepted a plea agreement with

the State under which he agreed to plead guilty to second-degree murder.[1]  In exchange, the State agreed to dismiss all other charges and recommend a term-of-years sentence.

[¶8.]    During the change-of-plea hearing, the court explained to the parties that Quevedo's decision to remain in adult court did not change the fact that Quevedo "was a juvenile at the time the offense occurred, and, therefore, is not subject to a penalty of mandatory life in prison without the possibility of parole."[2]  Quevedo told the court that he had blacked out at the time of the killing but had reviewed the evidence and had no doubt that he had killed Lord.  Quevedo also told the court that he understood his voluntary intoxication was not a defense to the killing.  The circuit court accepted the guilty plea and ordered a presentence investigation.

[¶9.]    At the subsequent sentencing hearing, the court heard testimony from several law enforcement officers who had responded to Lord's 911 call and others who had been involved in the murder investigation.  The court also saw the surveillance video footage of Quevedo's attack.  With different camera locations, the recorded footage showed Quevedo initially stabbing Lord seven times inside the store at roughly the same time Lord was pleading for help during the 911 call.  Lord

---

1.    Under SDCL 22-16-7, "[h]omicide is murder in the second degree if perpetrated by any act imminently dangerous to others and evincing a depraved mind, without regard for human life, although without any premeditated design to effect the death of any particular person . . . ."

2.    Second-degree murder is a Class B felony, and for adult offenders, it is punishable by a mandatory sentence of life in prison.  *See* SDCL 22-16-12 (classifying grades of murder offenses); SDCL 22-6-1 (listing authorized punishments).

moved away from Quevedo and through the convenience store's front door as Grady left the scene. The footage shows Quevedo move in the opposite direction in pursuit of Lord to continue his deadly knife attack in the parking lot, beyond the range of the surveillance cameras.

[¶10.] Quevedo's mitigation case focused on his difficult childhood, which included instability, domestic violence committed by his father, both parents' substance abuse, and his father's prolonged absences due to incarceration. In fact, in an unrelated appeal involving Quevedo's mother, we recounted the circumstances of a 2012 arrest involving his parents at the family's home. *See State v. Quevedo*, 2014 S.D. 6, ¶ 6, 843 N.W.2d 351, 353-54. Quevedo, then 12 years old, answered the door for law enforcement officers, who found both of his parents using drugs in the home.

[¶11.] Quevedo's mother testified at his sentencing, expressing pain and regret about the impact her addiction had on her family.[3] Another individual wrote in a letter of support that Quevedo grew up in an impoverished neighborhood plagued with drug abuse, lamenting that Quevedo "almost made it" out of his difficult circumstances when he was accepted at Riverside Indian School in Oklahoma. Additional evidence suggested that Quevedo had done well at the school and was highly regarded by his teachers. Though he had earned the right to participate in the high school graduation ceremony, he was unable to do so as he awaited trial for Lord's murder.

---

3. Quevedo's mother successfully addressed her drug addiction through a local drug court program.

[¶12.] Quevedo's other sentencing evidence indicated that he had a history of abusing cold medicine, alcohol, and marijuana. He continued his assertion that his consumption of all three during the evening of January 17 and early morning of January 18 had caused him to black out during Lord's murder. Quevedo contended that the substance abuse led him to aberrational conduct that he was incapable of committing under ordinary circumstances. To support the claim, he offered expert testimony from Dr. Teri Hastings, a forensic psychologist who conducted Quevedo's psychological evaluation. Dr. Hastings testified that Quevedo had tested within normal behavioral ranges, leading her to consider his claim of a blackout plausible. She also explained the physiological development of critical decision-making parts of the brain continues into the mid-20s for young males.

[¶13.] The circuit court recognized Quevedo's young age and the applicability of the United States Supreme Court's decision in *Miller v. Alabama*, which prohibits mandatory life sentences without the possibility of parole for juveniles. 567 U.S. 460, 465, 132 S. Ct. 2455, 2460, 183 L. Ed. 2d 407 (2012). Citing *Miller*, the circuit court explained the qualitative differences between juvenile offenders and adult offenders. The former, the court stated, are more vulnerable to "negative influences" and are less able "to extricate themselves from crime-producing circumstances." *See Miller*, 567 U.S. at 471, 132 S. Ct. at 2464. Accordingly, the court noted that a juvenile's actions are "less likely to evidence irretrievable depravity," resulting in diminished "penological justifications of retribution, deterrence and incapacitation." *See id.* at 472, 132 S. Ct. at 2465.

#28608

[¶14.] In its consideration of the sentencing evidence, the circuit court commented on the brutality of the crime, noting that Quevedo could have stopped stabbing Lord and fled with Grady, but instead chose to pursue Lord and continue the attack to a fatal conclusion. The court also noted that Quevedo was just eight months from his 18th birthday when he killed Lord and would have been subject to a mandatory life sentence had he been 18 at the time of the offense.

[¶15.] The court considered Quevedo's mitigating evidence, including his turbulent childhood, noting that Quevedo had developed his own difficulties with drug and alcohol abuse and had some prior involvement with the criminal justice system. The court, however, observed that Quevedo did not offer his troubled upbringing as an excuse for murdering Lord and had, in the court's view, accepted responsibility for his conduct. Quevedo was relatively mature compared to his peer group, the court noted, remarking that he grew up "long before young people ever dream of . . . ." Quevedo had done well at Riverside Indian School, the court stated, and had a history of caring for his younger siblings and had plans to join the military. The court credited Dr. Hastings' testing, which showed normal psychological behavior for a 17-year-old.

[¶16.] Given the seriousness of the offense, the court acknowledged the need to protect the community against the possibility that Quevedo would kill again. The court believed Quevedo presented a significant risk to public safety because the deliberate nature of Lord's murder established that he was capable of killing someone when under the influence.

[¶17.]    After weighing the evidence contained in the sentencing record, the court sentenced Quevedo to 90 years in prison, making him eligible for parole in 2062 when he is 62 years old.

[¶18.]    Quevedo raises two issues on appeal, which we restate as follows:

1.    Whether the circuit court's sentence violated categorical Eighth Amendment sentencing restrictions.

2.    Whether the circuit court's sentence was grossly disproportionate to his crime in violation of the Eighth Amendment.

## Analysis

### *Categorical Eighth Amendment Sentencing Restrictions for Juveniles*

[¶19.]    The Eighth Amendment to the United States Constitution, applied to the states through the Fourteenth Amendment, prohibits "cruel and unusual punishments," which the United States Supreme Court has interpreted to include "the right not to be subjected to excessive sanctions." *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1190, 161 L. Ed. 2d 1 (2005) (citing *Atkins v. Virginia*, 536 U.S. 304, 311, 122 S. Ct. 2242, 2246, 153 L. Ed. 2d 335 (2002)); *see also* U.S. Const. amend. VIII; S.D. Const. art. VI, § 23 (prohibiting the infliction of "cruel punishments"). "We review de novo whether a defendant's sentence is cruel and unusual in violation of the Eighth Amendment." *State v. Jensen*, 2017 S.D. 18, ¶ 9, 894 N.W.2d 397, 400.

[¶20.]    In a series of decisions over the past 15 years, the United States Supreme Court has created several categorical restrictions upon the imposition of the most severe sentences for juvenile offenders. In 2005, the Supreme Court held that sentencing a juvenile to death violates the Eighth Amendment. *Roper*, 543

U.S. at 578-79, 125 S. Ct. at 1200.  In *Graham v. Florida*, decided five years later, the Supreme Court held that imposing a sentence of life in prison without the possibility of parole for juveniles who commit non-homicide offenses constitutes cruel and unusual punishment.  560 U.S. 48, 82, 130 S. Ct. 2011, 2034, 176 L. Ed. 2d 825 (2010).  More relevant to this appeal is the United States Supreme Court's 2012 decision in *Miller*, which held that mandatory life sentences without parole for juvenile homicide offenders also violate the Eighth Amendment.  567 U.S. at 465, 132 S. Ct. at 2460.[4]

[¶21.]      Permeating these holdings is an overarching rationale that juveniles "are less deserving of the most severe punishments" due to their "'lack of maturity and an underdeveloped sense of responsibility' leading to recklessness, impulsivity, and heedless risk-taking."  *Id.* at 471, 132 S. Ct. at 2464 (first quoting *Graham*, 560 U.S. at 68, 130 S. Ct. at 2026; then quoting *Roper*, 543 U.S. at 569, 125 S. Ct at 1195).  The Supreme Court's decisions also account for juveniles' susceptibility to "'negative influences and outside pressures' [and] . . . limited 'control over their own environment'" along with the fact that juveniles' traits are "less fixed" than adults and their actions are "less likely to be 'evidence of irretrievable depravity.'"  *Id.* (quoting *Roper*, 543 U.S. at 569-70, 125 S. Ct. at 1195).  These tenets reflect the Supreme Court's inclination to view the Eighth Amendment's central concept of

---

4.      In 2016, the United States Supreme Court determined in *Montgomery v. Louisiana* that *Miller* applied retroactively to juveniles serving life-without-parole sentences.  ___ U.S. ___, 136 S. Ct. 718, 728, 193 L. Ed. 2d 599 (2016).  The *Montgomery* holding was the basis for resentencing the defendants in *State v. Charles*, 2017 S.D. 10, 892 N.W.2d 915, and *Jensen*, 2017 S.D. 18, 894 N.W.2d 397.

proportionality "less through a historical prism than according to 'the evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 469-70, 132 S. Ct. at 2463 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102, 97 S. Ct. 285, 290, 50 L. Ed. 2d 251 (1976)).

[¶22.]     The *Miller* holding instructs sentencing courts to consider the following individualized factors to adequately account for the offender's status as a juvenile:

> (1) the chronological age of the juvenile, (2) the juvenile's immaturity, impetuosity, irresponsibility, and recklessness, (3) family and home environment, (4) incompetency in dealing with law enforcement and the adult criminal justice system, (5) the circumstances of the crime, and, most importantly, (6) the possibility for rehabilitation.

*State v. Springer*, 2014 S.D. 80, ¶ 14, 856 N.W.2d 460, 465-66 (citing *Miller*, 567 U.S. at 477-78, 132 S. Ct. at 2468).

[¶23.]     Here, Quevedo pled guilty to second-degree murder, which would have required a mandatory life sentence if he had been 18 at the time of the offense. However, *Miller* prohibits the imposition of a mandatory life sentence without the possibility of parole. The record here demonstrates that the circuit court was aware of this sentencing restriction and correctly perceived the limits of its sentencing authority when it considered Quevedo's sentence.

[¶24.]     The circuit court considered *Miller's* youthful offender sentencing factors. Specifically, the court acknowledged that Quevedo was 17 years old when he killed Lord, although the court also found Quevedo "much more mature than most [his age] . . . as he appeared to be the only responsible person in his home." The court recognized the difficult challenges Quevedo faced growing up and the serious dysfunction he had experienced in his home life. The court viewed this

mitigating evidence as contextual and determined that Quevedo had taken responsibility for his actions without using the circumstances of his upbringing as a reason to equivocate about the level of his culpability.

[¶25.] The court also noted that Quevedo had experience with law enforcement and the adult criminal justice system gained vicariously through his parents. His own direct experiences were limited to previous non-violent offenses and a term of juvenile probation declared unsuccessful after he absconded.

[¶26.] The details of Lord's murder included Quevedo's choice to pursue her and continue his knife attack after his friend had left the store with the beer. The circuit court observed that "of the thousands of people who have been through this system with drug and alcohol problems, and the millions of people nationwide, very few result in a violent act such as this . . . ." The circuit court also determined that Quevedo demonstrated consciousness of his crime in his effort to conceal his identity by quickly hiding the distinctive sweatshirt he had worn during the murder after he arrived at Grady's home.

[¶27.] The court contrasted the evidence of Quevedo's "polite and quiet" nature with the circumstances of Lord's murder. It recognized Quevedo's academic achievements while wondering aloud whether his vicious conduct was the result of the drugs, cold medicine, and alcohol or perhaps a consequence of his violent home life, asking rhetorically, "Why did it take the death of a woman who went to work to provide for her family and then paid the ultimate price protecting someone else's property to get [Quevedo] some help . . . ?"

[¶28.]     The court also considered the traditional sentencing factor of public safety:

> There is no way to predict his actions. The problem this Court has is that I have now seen the ultimate worst kind of result of the actions for which Mr. Quevedo is capable while under the influence of the variety of these substances: the death of another human being. And it is very difficult to run the risk that it could happen again to somebody else.

[¶29.]     The circuit court's ultimate decision to sentence Quevedo to a term of 90 years in the penitentiary with the possibility of parole at age 62 complies with *Miller* and our cases applying it. The court did not sentence Quevedo to a mandatory life sentence and sufficiently considered his youth when fashioning his sentence for Lord's murder. There is, therefore, no Eighth Amendment violation based upon the sentencing requirements set out in *Miller*.

[¶30.]     Quevedo's argument that his sentence is cruel and unusual because its length "condemns him to die in prison" overlooks the essential holding of *Miller*, which prohibits only *mandatory* life sentences for juvenile homicide offenders. 567 U.S. at 489, 132 S. Ct. at 2475. Because mandatory life sentences deprive sentencing courts of the discretion to consider the impact of youth in determining an appropriate sentence, they are categorically cruel and unusual. *Id.* However, the Supreme Court has not extended *Miller* to discretionary life sentences, much less their functional, or de facto, equivalent. *See State v. Charles*, 2017 S.D. 10, ¶ 12, 892 N.W.2d 915, 920 ("The United States Supreme Court bars *mandatory* life sentences without parole against juvenile homicide offenders, not *discretionary* sentences of life without parole.").

[¶31.]     Notwithstanding this, our cases have seemed to suggest that a juvenile sentence involving a lengthy term of years and the lack of a meaningful opportunity for release could constitute a de facto life sentence and transgress *Graham's* categorical Eighth Amendment prohibition on life without parole—even in a homicide case. *See, e.g., id.* ¶ 15, 892 N.W.2d at 921 (first quoting *Springer*, 2014 S.D. 80, ¶ 23, 856 N.W.2d at 469; then quoting *Graham*, 560 U.S. at 82, 130 S. Ct. at 2034) ("A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with some realistic opportunity to obtain release before the end of that term."); *State v. Diaz*, 2016 S.D. 78, ¶ 58, 887 N.W.2d 751, 768 (citing *Springer*, 2014 S.D. 80, ¶ 24, 856 N.W.2d at 469) (contrasting defendant's opportunity for parole with defendant's inability to obtain parole in *Graham*); *Jensen*, 2017 S.D. 18, ¶ 13, 894 N.W.2d at 401 (analyzing the life sentence "functional equivalent" argument by citing *Diaz*, which, in turn, cites *Springer* and *Graham*).[5]

[¶32.]     We take this opportunity to reaffirm and clarify that *Graham's categorical* bar upon all life-without-parole juvenile sentences applies only to *non-homicide* cases.[6]  For juvenile *homicide* offenders, like Quevedo, *Miller's* Eighth

---

5.    Though the facts of *Springer* involved a homicide, the defendant pled guilty to the non-homicide offense of kidnapping.

6.    Quevedo does not directly ask that we expand the Supreme Court's categorical prohibition for mandatory life sentences in homicide cases, but in his reply brief, he submits that his argument for an Eighth Amendment violation "aligns with *Miller's* statements" about the exceptional nature of any life sentence for a juvenile.  This is a reference to the *Miller* Court's comments following its decision not to address the two petitioners' alternative argument that any life sentence for a juvenile violates the Eighth

(continued . . .)

Amendment restriction is narrower than *Graham's*, undoubtedly because homicide offenses represent a more serious class of crimes.[7] Of course, *Graham's* essential statements about youth can apply to all juvenile sentencings. *See Miller*, 567 U.S. at 473, 132 S. Ct. at 2465 ("[N]one of what [*Graham*] said about children—about their distinctive (and transitory) mental traits and environmental vulnerabilities—is crime-specific."). But discretionary sentences for juvenile offenders convicted of homicide offenses are not amenable to a *Graham*-style attack as de facto life sentences. Indeed, life sentences imposed as a matter of discretion upon juveniles in homicide cases do not violate any of the *categorical* Eighth Amendment limitations established in *Roper*, *Graham*, or *Miller*.[8]

---

(. . . continued)

Amendment, effectively extending *Graham* to homicide cases. We see no reason to consider Quevedo's claim further, however, because we are also not inclined to extend *Graham* and because our Legislature has acted to prohibit all life sentences for juveniles. *See infra* ¶¶ 33-34.

7. The United States Supreme Court in *Graham* "took care to distinguish [non-homicide] offenses from murder, based on both moral culpability and consequential harm." *Miller*, 567 U.S. at 473, 132 S. Ct. at 2465 (citing *Graham*, 560 U.S. at 69, 130 S. Ct. at 2027).

8. Quevedo urges us to consider decisions from other jurisdictions, holding that a lengthy term-of-years sentence "condemns a juvenile to die in prison." *See McKinley v. Butler*, 809 F.3d 908 (7th Cir. 2016) (granting habeas relief for a court's failure to address *Miller* factors when it sentenced a juvenile in 2004 to a discretionary 100-year sentence for first-degree murder and deadly use of a firearm); *People v. Caballero*, 282 P.3d 291 (Cal. 2012) (holding that sentencing a juvenile to two discretionary 110-year sentences for three counts of attempted murder constitutes cruel and unusual punishment); *Henry v. State*, 175 So. 3d 675 (Fla. 2015) (holding a juvenile's aggregate 90-year term-of-years discretionary sentence for a non-homicide offense unconstitutional). These cases are not helpful here. *Henry* and *Caballero* did not involve homicide offenses, and the federal appeals panel in *McKinley* applied "the

(continued . . .)

[¶33.]     Separate and apart from these categorical constitutional Eighth Amendment restrictions, however, our criminal code contains a definitive prohibition on life sentences for juveniles.  Following the *Miller* decision, our Legislature enacted two statutes which forbid *all* life sentences, mandatory or discretionary, for *any* offense by a juvenile, homicide or non-homicide.  *See* SDCL 22-6-1 and SDCL 22-6-1.3.

[¶34.]     The text of SDCL 22-6-1 states that "[i]f the defendant is under the age of eighteen years at the time of the offense and found guilty of a Class A, B, or C felony, the maximum sentence may be a term of years in the state penitentiary . . . ."  In perhaps more direct terms, SDCL 22-6-1.3 provides simply, "[t]he penalty of life imprisonment may not be imposed upon any defendant for any offense committed when the defendant was less than eighteen years of age."  Although we have previously observed that "[a] life sentence is commonly understood to mean spending the rest of one's life in prison," *Charles*, 2017 S.D. 10, ¶ 16, 892 N.W.2d at 921 (citation omitted), we have not interpreted the text of SDCL 22-6-1.3 in connection with a de facto life sentence claim.  *See also* SDCL 24-15-4 ("No inmate sentenced to life imprisonment is eligible for parole . . ." except in the case of compassionate parole).  We think it is unnecessary to do so in this case for two reasons.

[¶35.]     First, Quevedo has not specifically argued that the circuit court exceeded its statutory sentencing authority by imposing a de facto life sentence.

---

(. . . continued)

      logic of *Miller*" and granted habeas relief because the original sentencing court had given *no* discernible consideration to the defendant's youth.

Second, even if he had, Quevedo will be eligible for parole at age 62, which is within his life expectancy, and we do not deem this sentence to be a de facto life sentence. Though stated in the Eighth Amendment context, we have previously held in several decisions that comparable term-of-years sentences for juvenile offenders did not constitute a de facto life sentence where the defendant will become eligible for parole before reaching the defendant's life expectancy. *See, e.g.*, *Charles*, 2017 S.D. 10, ¶ 16, 892 N.W.2d at 921 (resentencing a juvenile to a 92-year discretionary sentence for first-degree murder with parole eligibility at age 60 is not a life sentence); *Jensen*, 2017 S.D. 18, ¶ 18, 894 N.W.2d at 402 (resentencing a juvenile to concurrent 200-year discretionary sentences for first-degree murder and kidnapping with parole eligibility at age 39 is not a de facto life sentence); *Diaz*, 2016 S.D. 78, ¶ 58, 887 N.W.2d at 768 (sentencing a juvenile to 80 years for first-degree murder and kidnapping with parole eligibility after 40 years is not a de facto life sentence).

### *Case Specific Eighth Amendment Proportionality*

[¶36.] As an alternative to his claim that his 90-year sentence constitutes a categorical Eighth Amendment violation, Quevedo also argues his sentence violates the Eighth Amendment because it is disproportionate to his second-degree murder conviction. "Under the Eighth Amendment to the United States Constitution, 'a criminal sentence must be proportionate to the crime for which the defendant has been convicted.'" *Diaz*, 2016 S.D. 78, ¶ 51, 887 N.W.2d at 766 (quoting *Solem v. Helm*, 463 U.S. 277, 290, 103 S. Ct. 3001, 3009, 77 L. Ed. 2d 637 (1983)).

[¶37.] In *Diaz,* we held that the Eighth Amendment does not require strict proportionality between the crime and the sentence, but instead "forbids only

extreme sentences that are 'grossly disproportionate' to the crime." 2016 S.D. 78, ¶ 51, 887 N.W.2d at 766 (quoting *Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). We determine gross disproportionality by comparing the "gravity of the offense against the harshness of the penalty." *Id.* We also "consider other conduct relevant to the crime" when reviewing a sentence for gross disproportionality. *Id.* ¶ 52, 887 N.W.2d at 767 (quoting *State v. Garreau*, 2015 S.D. 36, ¶ 12, 864 N.W.2d 771, 776). Only if this threshold inquiry reveals gross disproportionality will we compare Quevedo's sentence to other sentences imposed on juveniles convicted of second-degree murder. *See id.* ¶ 51, 887 N.W.2d at 766.

[¶38.] Here, Quevedo has not met the threshold inquiry by demonstrating gross disproportionality. Regarding the gravity of the offense, Quevedo's second-degree murder conviction ranks high in its "relative position on the spectrum of all criminality." *Id.* ¶ 52, 887 N.W.2d at 766 (quoting *State v. Chipps*, 2016 S.D. 8, ¶ 35, 874 N.W.2d 475, 487); *see also State v. Rice*, 2016 S.D. 18, ¶ 14, 877 N.W.2d 75, 80 (quoting 4 William Blackstone, *Commentaries*, *177-78) ("[H]omicide has long been considered 'the highest crime against the law of nature, that man is capable of committing.'"). Quevedo brutally killed Lord by stabbing her 38 times to facilitate the theft of a case of beer. After initially stabbing her in the convenience store, he pursued Lord to the parking lot and continued his knife attack, leaving her bleeding to death on the pavement. The circumstances suggest a high level of aggression and gratuitous violence. As the circuit court observed, Quevedo made the deliberate

choice to pursue Lord, repeatedly stabbing her long after Grady had left with the beer.

[¶39.] The second portion of the inquiry—the harshness of the penalty—requires us to consider "the penalty's relative position on the spectrum of permitted punishments." *Diaz*, 2016 S.D. 78, ¶ 54, 887 N.W.2d at 767 (quoting *Chipps*, 2016 S.D. 8, ¶ 37, 874 N.W.2d at 488). When considering the harshness of the penalty, we also consider whether the defendant is eligible for parole. *See id.* ¶ 55, 887 N.W.2d at 768. As indicated above, the maximum sentence a juvenile can receive under SDCL 22-6-1 is "a term of years in the state penitentiary, and a fine of fifty thousand dollars . . . ." The court's 90-year sentence leaves Quevedo eligible for parole in 45 years. He received credit for 428 days served and was ordered to pay only costs and reimbursements amounting to less than $2,000. This punishment, on the spectrum of possible punishments for second-degree murder, is not unduly harsh.

[¶40.] Of course, Quevedo was 17 years old at the time of the offense, but as indicated above, the circuit court was keenly aware of the mitigating effect of Quevedo's youth as a general proposition. The court also understood and weighed the impact of specific aspects associated with his difficult childhood.

[¶41.] After considering the gravity of the offense and assessing the relative harshness of Quevedo's sentence, we conclude that he cannot meet the initial requirement to show that his sentence is grossly disproportionate to his crime. His alternative Eighth Amendment claim is, therefore, unsustainable, and it is

unnecessary to compare Quevedo's sentence against those of other defendants convicted of second-degree murder.

## Conclusion

[¶42.] Quevedo's 90-year discretionary sentence does not offend the Eighth Amendment's prohibition against cruel and unusual punishment, either as a categorically prohibited mandatory life sentence or as a sentence that is disproportionate to the offense. We affirm.

[¶43.] GILBERTSON, Chief Justice, and KERN, JENSEN, and DEVANEY, Justices, concur.