#29263-a-JMK
**2021 S.D. 22**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

SHAWN MICHAEL SHELTON,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
YANKTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CHERYLE W. GERING
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

SARAH THORNE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
                                           appellee.

LUCI YOUNGBERG
Yankton County Public Defender
Yankton, South Dakota                    Attorneys for defendant and
                                           appellant.

* * * *

CONSIDERED ON BRIEFS
JANUARY 11, 2021
OPINION FILED **04/14/21**

KERN, Justice

[¶1.] Following a jury trial, Shawn Michael Shelton (Shelton) was convicted of three felony drug offenses in connection with the sale of methamphetamine to a confidential informant (CI). He appeals, alleging that the circuit court abused its discretion by denying his motions to admit a written agreement with an informant and two demonstrative exhibits and for a new trial. He also contends that the sentence he received was cruel and unusual in violation of the Eighth Amendment. We affirm.

**Facts and Procedural History**

[¶2.] Detective Joseph Erickson (Detective Erickson) of the Yankton Police Department and Special Agent Ryan Pennock (Agent Pennock) of the South Dakota Division of Criminal Investigation (DCI) approached a 25-year-old woman to work as a CI to make controlled purchases of methamphetamine in the Yankton, South Dakota community. Before being enlisted to work as a CI, the woman was regularly contacting Shelton and purchasing methamphetamine from him on a weekly basis. She had previously used methamphetamine with Shelton, who sometimes assisted her in taking it intravenously. As a CI, she was instructed to negotiate purchases in the same manner as she had done for personal use in the past. She signed a standard written agreement including a statement that she would refrain from using illegal substances. Further, by oral agreement, she was to receive $200 in compensation for completing each of the five controlled purchases, totaling $1000.

[¶3.] On the evening of July 10, 2018, Detective Erickson, Agent Pennock, and other officers attended a law enforcement briefing to prepare a plan for the CI's

controlled purchase of methamphetamine from Shelton that night. Detective Erickson and Agent Pennock made contact with the CI near a middle school, located 353 feet from Shelton's home in Yankton. The CI had been communicating with Shelton via Facebook Messenger and made arrangements to buy half a gram of methamphetamine for $50. After discussing safety measures and the route she would take to and from Shelton's home, law enforcement searched the CI and equipped her with a transmitting and recording device. They gave her $50 of pre-recorded, drug-buy money from the DCI Controlled Buy Fund to use in the transaction and watched her walk in the direction of Shelton's home. Yankton County Deputy Sheriff Darren Moser (Deputy Moser) was parked across the street to conduct surveillance and render aid if necessary.

[¶4.] The CI spoke with Shelton on the phone as she approached his home. He expressed concern that someone had dropped her off, which she denied, saying she was on her way from babysitting. When the CI arrived, Shelton was outside sweeping the sidewalk. He was high and paranoid and said that cars had been circling the area. Although the CI reported not seeing anything on the sidewalk, she did see a substance she believed to be methamphetamine scattered on the stairs going down into his basement apartment.

[¶5.] Once in the apartment, Shelton had the CI put her two phones in a clear plastic container, which he then placed under a chair on the far side of the living room. She told him her boyfriend had given her one of the phones. He still suspected she was wired and wrote a note to that effect. She pulled up her shirt to prove that she was not wearing a wire. As a result of Shelton taking her phones,

law enforcement lost the ability to monitor what was happening for nearly eight minutes. Police Sergeant Monty Rothenberger (Sergeant Rothenberger) was dispatched to Shelton's home to check on the CI's well-being. During this time frame, the drug transaction occurred. When Sergeant Rothenberger knocked, the CI retrieved her phones and then answered the door. Sergeant Rothenberger asked questions under the pretense of looking for a neighbor. Seeing that the CI was uninjured, he went on his way, after which the CI left Shelton's home for the post-buy meeting location.

[¶6.]       Upon her arrival, the CI was debriefed by Detective Erickson and Agent Pennock about the transaction. She told the officers that she believed that the substance on the stairs was methamphetamine, possibly as much as two or more grams and that Shelton had likely dropped it because he was so high. The CI explained that after she placed the phones in the plastic container, Shelton shaved off and weighed a portion of methamphetamine that came out of "his pocket in a uh like a round container like uh, like a tobacco container with those speckled packets in it." Detective Erickson asked if she meant a chewing tobacco tin, and she said "yeah." She also explained that just before Sergeant Rothenberger knocked on Shelton's door, Shelton placed the methamphetamine in a baggie. The CI gave him the drug buy money and took the baggie. She reported that she declined an offer to use it with him and did not arrange any future deals. Detective Erickson performed a standard search of her person and confirmed that she had turned over all of the methamphetamine she had acquired. The officers stopped the recording, paid her $200, and drove her to another location. The South Dakota Public Health

Laboratory subsequently tested the contents of the bag and confirmed that the substance was forty-eight hundredths of a gram of methamphetamine.

[¶7.]     Shelton was in the custody of the Department of Corrections serving separate sentences when he was indicted by a Yankton County grand jury for possession of a controlled substance, in violation of SDCL 22-42-5; distribution of a controlled substance, in violation of SDCL 22-42-2; and distribution of a controlled substance in a drug free zone, in violation of SDCL 22-42-19. The State also filed a habitual offender information alleging that Shelton had seven prior felony convictions, subjecting him to a two-level enhancement for each of the charges levied against him. SDCL 22-7-8.1.

[¶8.]     A two-day jury trial began on December 12, 2019. Before calling the first witness at trial, the State advised the court that it had prepared a transcript of the tape of the CI's interaction with Shelton on July 10, 2018. The State requested permission for the jury to follow along with the transcript while the audio recording was played. The court not only granted the request but ordered that both the tape and transcript would be admitted into evidence and sent with the jury for their use during deliberations. Shelton agreed that the transcript was accurate and had no objection to the transcript being admitted for the jury's consideration.

[¶9.]     Prior to the time that the tape was played, however, the court, on its own initiative, revisited the issue and changed its ruling on the admissibility of the transcript. After reviewing caselaw and South Dakota Pattern Jury Instruction 4-

1-5,[1] the court ordered that the transcript would be collected after the tape was played and not admitted as substantive evidence.

[¶10.]     The court also presented the parties with a proposed limiting instruction advising the jury that the recording itself was the primary evidence and the transcript merely a demonstrative aid. Neither party objected to the instruction. Before the audio recording was played, the court read the instruction to the jury and gave each member a written copy.

[¶11.]     Shelton elected not to testify at trial, instead developing his defense that the CI brought the drugs to the transaction through his cross-examination of the witnesses.[2] At the close of the evidence, Shelton moved for a directed verdict, which the circuit court denied, and the case was submitted to the jury. Despite the court's ruling to the contrary, the transcript was inadvertently included with the other exhibits and sent back to the jury. The jurors wrote a note to the bailiff asking for a device to listen to the recording again but reached a verdict before the court responded. The jury convicted Shelton of all three counts.

[¶12.]     Shelton filed a motion for a new trial, arguing that he was prejudiced by the circuit court's error. He contended that allowing the transcript to go to the jury violated the court's ruling and was contrary to law. At a January 2, 2020 hearing on the motion, the circuit court denied Shelton's request for a new trial,

---

1.     This instruction includes a comment advising that "[t]he transcript, absent stipulation of the parties, should not go to the jury room. *See United States v. Kirk*, 534 F.2d 1262, 1276 (8th Cir. 1976)."

2.     Although defense counsel referred to a motion for a directed verdict, such motions were abolished by SDCL 23A-23-1, which provides that "motions for judgment of acquittal shall be used in their place."

stating that it would have allowed the transcript to go back with the jury if the parties had so requested because the audio was garbled and difficult to understand without it.

[¶13.] Shelton admitted to six of the seven prior felony convictions listed in the habitual offender information. The court ordered a presentence report and scheduled a sentencing hearing. The court sentenced Shelton to serve fifteen years for the possession and distribution counts, to run concurrently to each other and to the sentences he was currently serving.[3] For the offense of distribution in a drug free zone, the court sentenced Shelton to serve twenty-five years, with fifteen years suspended, to run consecutively to his other sentences.

[¶14.] Shelton appeals, raising three issues which we reformulate as follows:

I. Whether the circuit court abused its discretion by refusing to admit the written CI agreement and precluding demonstrative exhibits.

II. Whether the circuit court abused its discretion in denying Shelton's motion for new trial.

III. Whether Shelton's sentence constitutes cruel and unusual punishment.

**Issues**

*I. Whether the circuit court abused its discretion by refusing to admit the written CI agreement and precluding demonstrative exhibits.*

[¶15.] Shelton contests two evidentiary rulings made by the circuit court during his jury trial. First, Shelton sought admission of the written CI agreement

---

3. Shelton was serving time in the penitentiary on four prior Yankton County felony convictions.

for the purpose of proving that the CI was paid. The State objected on the grounds of relevance, arguing the desired evidence was not in the agreement. Additionally, the State pointed to its public policy interest in protecting CI agreements from becoming a matter of public knowledge. The circuit court agreed and denied Shelton's request, finding it irrelevant and unfairly prejudicial. Second, Shelton requested the opportunity to use two demonstrative exhibits—a chewing tobacco tin and a golf ball—during the cross-examination of the CI. The circuit court ruled that even if the evidence was relevant, any probative value would be substantially outweighed by the danger of misleading the jury and, with reference to the golf ball, a needless presentation of evidence.

[¶16.]    "'[A] trial court's evidentiary rulings are presumed to be correct.' We review evidentiary rulings for abuse of discretion." *State v. Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d 404, 408 (quoting *State v. Crawford*, 2007 S.D. 20, ¶ 13, 729 N.W.2d 346, 349) (alteration in original). "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Rodriguez*, 2020 S.D. 68, ¶ 41, 952 N.W.2d 244, 256 (quoting *State v. Spaniol*, 2017 S.D. 20, ¶ 12, 895 N.W.2d 329, 335). To warrant reversal, "not only must error be demonstrated, but it must also be shown to be prejudicial." *State v. Stone*, 2019 S.D. 18, ¶ 22, 925 N.W.2d 488, 497 (quoting *Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d at 408). "Prejudicial error is error which in all probability produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Casper Lodging, LLC v.*

*Akers*, 2015 S.D. 80, ¶ 60, 871 N.W.2d 477, 496 (quoting *Harter v. Plains Ins. Co., Inc.*, 1998 S.D. 59, ¶ 32, 579 N.W.2d 625, 633).

[¶17.]     "Evidence is relevant if: (a) [i]t has any tendency to make a fact more or less probable than it would be without the evidence; and (b) [t]he fact is of consequence in determining the action." SDCL 19-19-401. When evidence has been deemed relevant, "the balance tips emphatically in favor of admission unless the dangers set out in Rule 403 'substantially' outweigh probative value." *State v. Janklow*, 2005 S.D. 25, ¶ 38, 693 N.W.2d 685, 698 (quoting *State v. Wright*, 1999 S.D. 50, ¶ 14, 593 N.W.2d 792, 799). "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." SDCL 19-19-403. "Prejudice 'refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.'" *State v. Birdshead*, 2015 S.D. 77, ¶ 63, 871 N.W.2d 62, 83 (quoting *State v. Moeller*, 1996 S.D. 60, ¶ 38, 548 N.W.2d 465, 478).

[¶18.]     We turn first to the circuit court's refusal to admit the written CI agreement. With reference to compensation, the agreement provided that law enforcement would "furnish funds only to cover the purchase price of any controlled substances or contraband purchased after this agreement is in effect[.]" The court found that "the actual document itself has no purpose at this point in time" and excluded it under Rule 403 as cumulative and misleading. Shelton argues that the oral agreement was dependent on the written agreement and that any confusion

about the two agreements could have been cleared up by questioning the witnesses. In response, the State argues that the written CI agreement should remain confidential and was irrelevant for the purpose for which Shelton sought to introduce it because it did not include the terms of the CI's compensation.

[¶19.] Much of our caselaw pertaining to CIs concerns the tension between an individual defendant's interest in disclosure of a CI's *identity* and the State's public policy interest in nondisclosure. While the question herein involves admission of the written CI agreement rather than the CI's identity, much of the same reasoning applies. The disclosure of information regarding CIs is not always appropriate. *State v. Wellner*, 318 N.W.2d 324, 332 (S.D. 1982) ("The public's interest in protecting the flow of information must be balanced against the individual's right to prepare his defense." (citing *Roviaro v. United States*, 353 U.S. 53, 62, 77 S. Ct. 623, 629, 1 L. Ed. 2d 639 (1957))). "While there is no litmus test for determining when disclosure is required, [the Eighth Circuit has] held that perhaps the most important factor for a court in this circumstance to consider is whether the [CI's] information is material to the defense." *United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003) (citing *United States v. Harrington*, 951 F.2d 876, 877 (8th Cir. 1991)). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* (quoting *Harrington*, 951 F.2d at 878) (alteration in original).

[¶20.] Guided by these principles, we find no abuse of discretion here. Shelton wanted the jury to see that the CI was compensated for her role in the controlled buy, but the written agreement did not provide this information. It

addressed only law enforcement's role in providing the funds necessary to purchase the controlled substances. Even though the agreement was not introduced, Shelton was permitted to fully explore the payment arrangements between the State and the CI both generally and for the July 10, 2018 transaction. Shelton thoroughly cross-examined the CI, Detective Erickson, and Agent Pennock on this point, and all acknowledged, including the CI, that she was paid for conducting the controlled buy. The circuit court did not err in finding that the limited probative value of the written agreement, as to the fact for which Shelton sought its admission, was substantially outweighed by the dangers of confusing the issues and presenting cumulative evidence. The court's ruling was not arbitrary or unreasonable, and Shelton did not show that the written agreement itself was material to his defense or that he was in any way prejudiced by its exclusion.

[¶21.] Nor do we conclude that the circuit court abused its discretion in refusing to permit the use of a chewing tobacco tin and a golf ball as demonstrative evidence. The circuit court denied the request, finding that, based on the descriptions that the CI gave to the officers, Shelton had failed to establish that the tin possessed by defense counsel was representative of the one used by Shelton. Moreover, Shelton was unable to lay further foundation in his examination of the CI. Shelton asked the CI on cross-examination if the methamphetamine was in a tobacco container, to which she testified: "Yeah. It was a little like that, but I don't know if that's exactly what it was." Because chewing tobacco tins come in various sizes and the CI did not identify the type of tin that she saw with enough specificity, the court denied admission of the particular tin proffered. As for the golf ball, the

court remarked that everyone had seen a golf ball, finding it unnecessary to introduce one into evidence.

[¶22.]     Shelton argues that he desired to impeach the CI's testimony by allowing the jury to see whether a golf ball-sized chunk of methamphetamine could fit into a chewing tobacco tin.  In Shelton's view, the circuit court abused its discretion by not allowing the demonstration.  The State, however, asserts the identification of the container as any particular type of tin can be attributed more to law enforcement's suggestions than the CI's own words and that the dimensions of the container are not a fact of consequence in the case.  The State contends that Shelton failed to show that the size and amount of methamphetamine in the container were pertinent to the verdict.

[¶23.]     Our court has long recognized the admissibility of demonstrative evidence.  *State v. Hartman*, 256 N.W.2d 131, 137 (S.D. 1977).  The purpose of demonstrative evidence is not its standalone probative value but rather making other admitted evidence easier for the jury to comprehend.  *See* Robert P. Mosteller, et al., *McCormick on Evidence* § 214 (8th ed. 2020).  "A demonstrative or illustrative exhibit 'is admissible if it clearly depicts the factual situations and will allow the trier of facts to more clearly understand a witness's descriptions.'" *Kaiser v. University Physicians Clinic*, 2006 S.D. 95, ¶ 24 n.3, 724 N.W.2d 186, 192 n.3 (quoting *Hartman*, 256 N.W.2d at 137).

[¶24.]     To lay the foundation for a duplicate of unavailable evidence, "[t]ypically, an aid will be identified by a witness, during the witness's testimony, as a substantially correct representation of something the witness once perceived and

is now describing." Mosteller, *supra* ¶ 23, § 214. We have held that this test was satisfied when the underlying substantive evidence was properly admitted and the demonstrative aid based upon it contained no additional information. *State v. Rough Surface*, 440 N.W.2d 746, 755 (S.D. 1989) (referring to two charts summarizing admitted evidence). "Whether the admission of a particular demonstrative aid will in fact be helpful, or will instead tend to confuse or mislead the trier, is a matter within the sound discretion of the trial court . . . ." Mosteller, *supra* ¶ 23, § 214.

[¶25.] Given the lack of certainty about the type of container from which Shelton produced the methamphetamine, the circuit court did not err in finding inadequate foundation for the exhibit. In order to introduce a demonstrative aid to illustrate the CI's testimony, Shelton's counsel needed to show that the aid clearly depicted the container the CI perceived and was describing. *See* SDCL 19-19-901 (requiring the proponent to "produce evidence sufficient to support a finding that the item is what the proponent claims it is"). Counsel failed to do so. Regardless, the CI's description of the container from which Shelton produced the methamphetamine was included in the recording played for the jury and admitted into evidence. Shelton was also able to further develop the CI's testimony through cross-examination. Additionally, after the container was properly excluded, the golf ball had no bearing on any of the issues in the case as the dimensions of the chunk of methamphetamine were not at issue in this case. The circuit court was within its discretion in denying this demonstrative evidence, and Shelton has not shown that he was prejudiced by the exclusion of the evidence.

### II. *Whether the circuit court abused its discretion in denying Shelton's motion for new trial.*

[¶26.] Shelton argues that denying his motion for a new trial was an abuse of discretion because, in his view, if the transcript had not been admitted, the jury would have reached a different conclusion. In response, the State asserts that Shelton, who failed to object to the use of the transcript, its accuracy, or the court's limiting instruction regarding its proper use, has failed to show any prejudice resulting from the jury's consideration of the transcript.

[¶27.] We review rulings on motions for new trials for an abuse of discretion. *State v. Rolfe*, 2014 S.D. 47, ¶ 9, 851 N.W.2d 897, 901 (citing *State v. Zephier*, 2012 S.D. 16, ¶ 15, 810 N.W.2d 770, 773). "We review a circuit court's denial of a motion for a new trial under SDCL 23A-29-1, the same as its civil counterpart SDCL 15-6-59(b)." *State v. Muhm*, 2009 S.D. 100, ¶ 43, 775 N.W.2d 508, 523. "[A] new trial may follow only where the violation has prejudiced the party or denied such party a fair trial." *State v. Hofman*, 1997 S.D. 51, ¶ 13, 562 N.W.2d 898, 902 (quoting *Robbins v. Buntrock*, 1996 S.D. 84, ¶ 6, 550 N.W.2d 422, 425) (alteration in original). When there is evidentiary support for the circuit court's findings underlying its decision to deny a motion for a new trial, this Court finds no abuse of discretion. *State v. Condon*, 2007 S.D. 124, ¶ 46, 742 N.W.2d 861, 875.

[¶28.] Although the circuit court initially admitted the transcript, it changed course, allowing its use for demonstrative purposes only. The transcript, however, was inadvertently sent back to the jury with the exhibits. SDCL 23A-25-7 permits the jury to take only the "exhibits and all papers which have been received as evidence in the case[]" into the jury room with them during deliberations. "The

delivery to the jury for their consideration of an exhibit not received in evidence constitutes error." *Osborne v. United States*, 351 F.2d 111, 115 (8th Cir. 1965) (citation omitted). *See also State v. Midgett*, 2004 S.D. 57, ¶ 20, 680 N.W.2d 288, 293 (holding that "[a]llowing the jury to consider such non-admitted evidence was prejudicial error that require[d] reversal").

[¶29.]     Because the transcript was not received as evidence, we review the error to determine its prejudicial effect. Here, the circuit court found that the quality of the audio recording was garbled, and, if the parties had asked, the court would have admitted the transcript for substantive purposes.[4] In this case, Shelton does not dispute that the State laid the proper foundation for admission of the

---

4.     "Under modern American practice it is common to allow many types of tangible exhibits to be taken by the jury into the jury room for consideration during the deliberations, provided that the exhibits have been formally admitted into evidence. The question whether a particular exhibit may be taken into the jury room is widely viewed as subject to discretionary control by the trial judge . . . ." Mosteller, *supra* ¶ 23, § 220.

"Courts have frequently commented that such [testimonial] writings, viewed as simply a different form of testimony, should not be unduly emphasized over oral testimony in the case. For this reason, the transcript of an audio recording which may be given to the jury during the playing of the recording is usually treated as a demonstrative aid to the jury's understanding. Thus, it is not admitted as evidence of the recording's contents and is not taken into the jury room during deliberation." *Id.*

We note that courts from other jurisdictions have affirmed convictions where demonstrative transcripts were sent to juries at their request during deliberations, absent a showing that the transcripts were inaccurate or that specific prejudice had occurred. *See, e.g.*, *United States v. Garcia*, 334 F. App'x 609, 616-18 (5th Cir. 2009) (holding any error harmless when an appropriate limiting instruction was given and the accuracy of the transcript was unchallenged); *United States v. Trent*, 306 F. App'x 482, 487 (11th Cir. 2009) (holding use of a transcript not formally marked into evidence was not error absent showing of inaccuracy or specific prejudice, especially when portions of the recording were inaudible).

recording itself. And the CI and law enforcement agents involved with the recording testified at trial. This is significant because, while the recording corroborated the CI's version of what occurred, the recording did not pick up the exchange of drugs for money, and, accordingly, the transcript did not reference the actual drug buy.

[¶30.] In addition, Shelton raised no objection to the admissibility of the transcript as a demonstrative aid at trial, and the jury followed along with the transcript while the audio recording was played. Before the jury received the transcript and the recording was played, the court gave a limiting instruction both orally and in writing identifying the recording as the primary evidence.[5] "We presume the jury follows the [circuit] court's limiting instructions." *Stone,* 2019

---

5.  Limiting Instruction No. 1 reads as follows:

    As you have heard, there is a typewritten transcript of the tape recording you are about to hear. That transcript also undertakes to identify the speakers engaged in the conversation.

    You are permitted to have the transcript for the limited purpose of helping you follow the conversation as you listen to the tape recording, and also to help you identify the speakers. The transcript, however, is not evidence.

    Whether the transcript correctly or incorrectly reflects the conversation or the identity of the speakers is entirely for you to decide based upon what you have heard here about the preparation of the transcript, and upon your own examination of the transcript in relation to what you hear on the tape recording. The tape recording itself is the primary evidence of its own contents. If you decide that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

    Differences between what you hear in the recording and read in the transcript may be caused by such things as the inflection in a speaker's voice, or by inaccuracies in the transcript. You should, therefore, rely on what you hear rather than what you read when there is a difference.

S.D. 18, ¶ 20, 925 N.W.2d at 496 (quoting *State v. Ralios,* 2010 S.D. 43, ¶ 47, 783 N.W.2d 647, 660).

[¶31.]    Although the jurors were not meant to have the transcript during deliberations, they had the recording available for their review.  Where the jury had already considered the transcript as a demonstrative aid when it first heard the recording during trial, Shelton has not shown that the jury could have or likely would have reached a different verdict had the transcript not been included with the exhibits sent to the jury deliberation room.[6]

[¶32.]    Therefore, while the transcript was not intended to go back with the jury, the error was not prejudicial.  The court properly advised the jury that the tape recording of the buy was the best evidence of its own contents.  The CI testified about the details of the controlled buy and was subject to cross-examination.  The recording and the testimony provided sufficient evidentiary support for the jury to reach its verdict.  The circuit court did not abuse its discretion in denying the motion for a new trial.

---

6.    The Supreme Court of Wyoming held, under a plain error analysis, that allowing non-admitted demonstrative models used at trial to be taken into the jury room was erroneous but not sufficiently prejudicial to warrant reversal. *Worcester v. Wyoming,* 30 P.3d 47, 51-52 (Wyo. 2001) (reasoning that both prosecution and defense used the evidence, defense counsel had the opportunity to cross-examine the witness, and, as it was impossible to be sure what use, if any, the jury made of the demonstrative evidence, there was no reason to believe the outcome would have been more favorable to the defendant).

### III.  Whether Shelton's sentence constitutes cruel and unusual punishment.

[¶33.]    Shelton contends that his sentence is grossly disproportionate and constitutes cruel and unusual punishment under the Eighth Amendment.  He argues that the circuit court was predisposed to sentence him harshly based on the court's comment that it believed he would relapse in the future.  In response, the State argues that "Shelton has not shown that a term of years in the penitentiary is a cruel and unusual punishment for a defendant with at least six prior felony drug-related convictions, including two for distribution."[7]

[¶34.]    "We review de novo whether a defendant's sentence is cruel and unusual in violation of the Eighth Amendment."  *State v. Quevedo*, 2020 S.D. 42, ¶ 19, 947 N.W.2d 402, 406 (quoting *State v. Jensen*, 2017 S.D. 18, ¶ 9, 894 N.W.2d 397, 400).  "[T]he Eighth Amendment does not require strict proportionality between the crime and the sentence, but instead 'forbids only extreme sentences that are "grossly disproportionate" to the crime.'"  *Id.* ¶ 37, 947 N.W.2d at 410 (quoting *State v. Diaz*, 2016 S.D. 78, ¶ 51, 887 N.W.2d 751, 766).

[¶35.]    Following the United States Supreme Court's lead, we elected to make a "course correction" in our Eighth Amendment jurisprudence.  *See State v. Rice*, 2016 S.D. 18, ¶ 21, 877 N.W.2d 75, 82; *see also Harmelin v. Michigan*, 501 U.S. 957, 1001, 111 S. Ct. 2680, 2705, 115 L. Ed. 2d 836 (1991).  "Our inquiry for determining

---

7.    Although the habitual offender information included only one prior conviction in 2016 for possession with intent to distribute, the circuit court was aware that in 2013, Shelton bought methamphetamine from an undercover agent and in 2018, as a result of a traffic stop, was found in possession of more than an ounce of methamphetamine.  Shelton was never charged for these offenses.  Rather, both incidents led to parole violations.

gross disproportionality is [now] well established[.]" *State v. Holler*, 2020 S.D. 28, ¶ 11, 944 N.W.2d 339, 342. Our analysis begins with a comparison of "the gravity of the offense and the harshness of the penalty." *State v. Chipps*, 2016 S.D. 8, ¶ 38, 874 N.W.2d 475, 488 (quoting *State v. Garreau*, 2015 S.D. 36, ¶ 9, 864 N.W.2d 771, 775). "This comparison rarely 'leads to an inference of gross disproportionality' and typically marks the end of . . . review[.]" *Id.* (quoting *Garreau*, 2015 S.D. 36, ¶ 9, 864 N.W.2d at 775) (alteration in original).

[¶36.]        "[T]he gravity of the offense refers to the offense's relative position on the spectrum of all criminality." *Id.* ¶ 35, 874 N.W.2d at 487 (citation omitted). When an offender has committed prior offenses, we have concluded that "if the sentence is enhanced because of the offender's recidivism, then the gravity of his past offenses also contributes to the gravity of the present offense." *Id.* ¶ 36, 874 N.W.2d at 488 (citing *Ewing v. California*, 538 U.S. 11, 28, 123 S. Ct. 1179, 1189, 155 L. Ed. 2d 108 (2003)).

[¶37.]        When examining the harshness of the penalty, we consider "the penalty's relative position on the spectrum of all permitted punishments." *Id.* ¶ 37, 874 N.W.2d at 488 (citation omitted). The most severe punishments authorized by the Legislature include the death penalty (class A felonies), mandatory life in prison (class A and B felonies), and non-mandatory life sentences (class C felonies). *See* SDCL 22-6-1. There are six felony classifications that are less severe, setting forth maximum sentences ranging from 50 years for a class one felony down to two years for a class six felony. *See id.* We also consider whether a defendant may be eligible for parole in our examination of the sentence imposed. *Chipps*, 2016 S.D. 8, ¶ 37,

874 N.W.2d at 488 (citation omitted). When a defendant receives multiple sentences, "we evaluate the individual sentence for each count, [as] opposed to scrutinizing the aggregate sentence." *State v. Uhing*, 2016 S.D. 93, ¶ 18, 888 N.W.2d 550, 556 (quoting *State v. Dubois*, 2008 S.D. 15, ¶ 41, 746 N.W.2d 197, 210).

[¶38.] We begin by examining the gravity of Shelton's offenses. Shelton was found guilty of possession, distribution, and distribution in a drug free zone. The latter offense occurred near a middle school and a playground. He admitted to committing six of the seven prior drug-related felonies as alleged in the habitual offender information, one involving distribution. We have previously observed that:

> While [certain drug offenses] are classified as nonviolent in nature, they are nonetheless serious felonies. "Selling drugs is a harsh and unsavory business. Drug abuse has devastated countless American youth to include young South Dakotans. Drugs are a peril to our society. Our Legislature, recognizing this, made manufacture and distribution of certain controlled substances . . . a felony—a harsh crime."

*Uhing*, 2016 S.D. 93, ¶ 17, 888 N.W.2d at 555-56 (quoting *State v. Pettis*, 333 N.W.2d 717, 720 (S.D. 1983)) (cleaned up). Indeed, even nonviolent drug offenses pose significant risks to the public.[8]

[¶39.] Next, we examine the harshness of Shelton's sentences. Shelton, having admitted to committing "three or more [prior] non-violent felonies[,]" was subject to a two-level enhancement for each offense. SDCL 22-7-8.1. The circuit

---

8. Distributing a "significant amount of controlled substances[,]" such as methamphetamine, "inevitably cause[s] devastation to the community in which drugs [are] sold[.]" *United States v. Nunez-Hernandez*, No. CR 14-20 (08) (MJD), 2020 WL 6682494, at *2 (D. Minn. 2020). *See also Terrebonne v. Butler*, 820 F.2d 156, 158 (5th Cir. 1987) ("[I]t seems apparent that the retail dealer who sells in small amounts to the ultimate consumer is as vital a component in the . . . distribution chain as any other[.]").

court sentenced Shelton to two concurrent terms of fifteen years for the possession and distribution charges. Because this was Shelton's second distribution offense, he was subject to a minimum mandatory sentence in the state penitentiary of at least ten years, which could not be suspended, unless the court found mitigating circumstances. *See* SDCL 22-42-2. For the offense of distribution within a drug free zone, a class four felony carrying a minimum mandatory sentence of five years to be served consecutively to the sentence imposed for the principal felony, Shelton received a twenty-five-year sentence with fifteen years suspended. SDCL 22-42-19. While this minimum mandatory sentence could also be suspended upon a finding of mitigating circumstances, the court found none to justify deviation for either offense.

[¶40.] Shelton has been sentenced to a term of years for each count, and he is eligible for parole. Per the statutes applicable to Shelton's crimes, he could have faced an aggregate sentence of 65 years had he received maximum consecutive sentences for each count. Instead, he may be released on parole in as few as twelve years. The punishments imposed, when compared to the gravity of his offenses, do not appear grossly disproportionate, ending our review within the scope of the Eighth Amendment. Shelton's punishments as a habitual offender for possession, distribution, and distribution in a drug free zone are not cruel and unusual under the Eighth Amendment.

## Conclusion

[¶41.] The circuit court did not abuse its discretion by refusing to admit the written CI agreement into evidence or by precluding the demonstrative exhibits.

Shelton was able to cross-examine the CI and law enforcement to establish the terms of the CI's payment. The CI's perception of the container from which Shelton produced the methamphetamine was described in the recording that was admitted into evidence, and Shelton was able to further confront the CI's testimony through cross-examination. Nor did the court abuse its discretion in denying Shelton's motion for a new trial. While the transcript was inadvertently sent to the jury, Shelton has failed to establish that he was prejudiced. The court gave the jury a proper limiting instruction, the jury had already heard the recording with the aid of the transcript, and Shelton raised no objection to the use of the transcript at any time before or during trial.

[¶42.] Shelton is a habitual offender with six prior drug convictions. His sentence for three additional drug felonies, two of which the court permitted to run concurrently while suspending a portion of the third, is not grossly disproportionate to his crimes, or cruel and unusual.

[¶43.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.