#29946-a-MES
**2023 S.D. 53**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

RONALD MANUEL MYRON BLACK CLOUD,      Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE M. MATTHEW M. BROWN
Judge

* * * *

JOANNA LAWLER
LORI K. GOAD of
Pennington County Public
    Defender's Office
Rapid City, South Dakota                    Attorneys for defendant and
                                            appellant.


MARTY J. JACKLEY
Attorney General

JENNIFER M. JORGENSON
Assistant Attorney General
Pierre, South Dakota                        Attorneys for plaintiff and
                                            appellee.

* * * *

ARGUED
APRIL 26, 2023
OPINION FILED **10/04/23**

#29946

SALTER, Justice

[¶1.]     A jury found Ronald Black Cloud guilty of second-degree murder, and he was sentenced to 40 years in prison.  Black Cloud appeals, seeking review of multiple issues that arise from jury selection, the trial, and his sentencing.  We affirm.

## Factual and Procedural Background

[¶2.]     At approximately 10:00 p.m. on August 17, 2018, fourteen-year-old Black Cloud and sixteen-year-old Ross Johnson arrived at the Rapid City home of their friend, K.C., intending to invite him to join them.[1]  The events thereafter are in dispute, but it is uncontroverted that K.C.'s mother, Shayla Colbert Graham, was joined at the door by her husband, Nathan Graham; Nathan and Johnson had some sort of altercation that led into the street; Black Cloud fired a handgun twice; and one of the bullets traveled about 69 feet before fatally striking Nathan in the head.[2]

[¶3.]     Officers located Johnson on August 18 at a Meade County residence and took him into custody.  Johnson was tried as an adult and eventually pled guilty to aggravated assault and accessory to a crime in connection with the incident on August 17.  He was sentenced to 20 years in prison.

[¶4.]     Two days after fleeing the scene of the shooting, Black Cloud appeared at the Public Safety Building in Rapid City and turned himself in to law

---

1.     Based on his testimony at trial, Black Cloud consumed around five shots of vodka and took two tabs of LSD in the hours leading up to their arrival at the house.

2.     Because the surname "Graham" is common to both Shayla and Nathan, we will use their first names to avoid confusion.

enforcement officers. During a subsequent interview, Black Cloud initially claimed that Johnson shot Nathan. Then he pivoted to a version in which he claimed to have shot Nathan at close range as Nathan was "coming at me[.]"[3] In his final version, Black Cloud stated he shot Nathan after Johnson told him to shoot. Black Cloud was inconsistent about his position relative to Nathan when he fired, but two shell casings were discovered about 69 feet from Nathan's body.

[¶5.] Because of his age, the State initially filed a petition alleging that Black Cloud was a delinquent child. Though not part of the record here, the circuit court ultimately granted the State's request to transfer Black Cloud's case to adult court. *See* SDCL 26-11-3.1 to -4 (describing the transfer process from juvenile court to adult court).

[¶6.] A Pennington County grand jury subsequently indicted Black Cloud for second-degree murder in violation of SDCL 22-16-7. He pled not guilty, and the case was tried to a jury.

### *Voir dire*

[¶7.] During jury selection, the prosecutor acknowledged Black Cloud's young age and asked the members of the venire if anybody knew who decided whether Black Cloud would be tried in juvenile or adult court. One potential juror responded, "[i]s it the State's Attorney's Office?" The prosecutor answered "no" and then later indicated "the decision to try Mr. Black Cloud as an adult was a decision made by the Court." This drew an objection from the defense, and during a

---

3. Black Cloud testified that this fabricated version was to support a self-defense theory.

discussion held outside the presence of the jury, Black Cloud's attorney expressed concerns that the prosecutor's questions and discussion with potential jurors were misleading because they created the incorrect inference that the State had no role in the decision to try Black Cloud as an adult.[4]

[¶8.] The circuit court ultimately agreed with the defense and determined that the prosecutor's statements should be clarified to reflect the fact that the State requested the transfer of the juvenile case to adult court, which the prosecutor agreed to explain. Back in the presence of the jury, the prosecutor clarified that "[i]n this particular case, the State's Attorney's Office . . . applied to move the case to adult court. Over years and litigation, that issue was decided by the Court."

[¶9.] After the clarification, the prosecution proceeded to ask a large number of individual prospective jurors if they could set aside Black Cloud's age and convict him of the charges if the prosecution met its burden of proof. The responses were strongly affirmative—potential jurors indicated a willingness to accept the fact that Black Cloud was being tried as an adult and decide the case based upon the evidence.

[¶10.] During this discussion, one potential juror asked the prosecutor about the "criteria" used to make the decision to transfer the juvenile case to adult court, prompting the circuit court to intervene. The court provided an instruction that

---

4. The prosecutor criticized defense counsel's objection as a "failed attempt to prejudice the state, make us look like the bad guys"—something the prosecutor said she had sought to avoid by carefully phrasing the question to focus only on the actual *decision* to try Black Cloud as an adult.

removed the basis for Black Cloud's transfer to adult court from the venire

members' consideration and focused them on the jury's fact-finding role.

[¶11.]    Notwithstanding these efforts, Black Cloud's attorney moved for a

mistrial a short while later arguing, "I think that there's a grave concern that the

jury is under now a belief that this Court has made determinations as to the

validity of the charges."  The court denied the motion, believing its instructions

cured any possible basis for the mistrial.

[¶12.]    Also during jury selection the prosecutor stated, without objection:

> So one of the other issues that's going to come up is that Ronald
> Black Cloud on the night that this happened was with another
> young person whose name is Ross Johnson.  Ross Johnson was
> charged in this case with the same crime that Ronald Black
> Cloud is charged with and he has since pled guilty and he's
> going to be a testifying witness . . . .  He's pled guilty and been
> sentenced.  But he was asked as part of his plea agreement to
> testify in this case.  So he is testifying as part of a plea
> agreement.  How do you feel about that?

[¶13.]    As it turned out, however, Johnson refused to testify, and the State did

not call him as a witness.  The subject of Johnson's plea did arise during the trial,

though, during Black Cloud's cross-examination of a detective who stated that he

was aware Johnson had pled guilty and also that Johnson had changed his account

of the events multiple times during police interviews.  The detective also

acknowledged that Johnson had been offered the opportunity to plead guilty to

"reduced charges."

[¶14.]    In an additional effort to address Johnson's absence, Black Cloud later

proposed a jury instruction that provided "the witness's guilty plea can be

considered by you only for the purposes of determining how much, if at all, to rely

on that witness's testimony[.]"  The circuit court refused the instruction, however, because Johnson had not been a witness at trial, though Black Cloud's attorneys offered to revise the instruction to eliminate the witness reference.

[¶15.]    Given Johnson's refusal to testify at trial, the eyewitness accounts of the altercation were limited to Shayla and Black Cloud, who elected to testify in his own defense.  As noted above and detailed below, there were notable differences between their versions of what happened that night.

### Shayla's trial testimony

[¶16.]    According to Shayla's testimony, she and Nathan were in their living room at approximately 10:00 p.m. on August 17 when she heard a knock at her door.  Shayla went to the door and found Johnson standing in the doorway.  She also noticed Black Cloud, who was unknown to her at the time, positioned behind Johnson.  In a "forceful and aggressive" manner, Johnson asked Shayla if K.C. was home.  Having previously made it clear to Johnson that he was not welcome at their home, Shayla attempted to tell him to leave but was "cut off" by Johnson's insistence that he "can go wherever [he] want[s] to."[5]

[¶17.]    Shayla testified that Nathan came to her side near the doorway and asked "[w]hy do you keep coming here knowing you're not supposed to be here?"  Johnson continued to claim that he was free to go where he liked and told Nathan,

---

5.    Shayla recalled that she told Johnson that he was not welcome in their home and that she had discouraged K.C. from spending time with Johnson following a number of incidents in which Johnson and K.C. were caught drinking in Shayla's home.  Further contributing to her opinion of Johnson was a nonspecific reference to a situation in which Johnson and K.C. became involved with a stolen vehicle.

"You can't make me stop coming here." An argument between Nathan and Johnson ensued, but Black Cloud did not participate—in fact, Shayla did not recall hearing Black Cloud say anything at any point that night.

[¶18.] The argument continued as Nathan stepped beyond the threshold, and Shayla stated that Johnson took a step back and lifted his shirt to reveal a pistol handle sticking out of his waistband. In response, Nathan said "I'm not scared of guns. I'm from Brooklyn." Still arguing, Nathan stepped toward Johnson and Johnson continued facing Nathan as Johnson stepped backward. The argument then became physical with Johnson pushing Nathan and Nathan pushing back. The pair continued exchanging pushes down the driveway toward the street, as Nathan repeatedly told Johnson to leave. At some point, Johnson threw an errant punch at Nathan, which Shayla recalled was the only attempted punch during the altercation.

[¶19.] Near the end of the driveway, Johnson fell to a knee following a push, stood up, and started walking away, unpursued by Nathan. Shayla, who remained outside and positioned behind Nathan, observed Johnson walk down the street approaching Black Cloud who had not participated in the argument at any point. Shayla testified that she had "barely seen him the whole time everything was going on."

[¶20.] Believing the confrontation to be over, Shayla turned back and started toward the house when she heard "two or three" gunshots. Shayla did not see who fired the gun but fell to the ground after feeling what she believed was Nathan pushing her on the back. Then, without looking back, she crawled into the house

and called the police.[6]  After calling for help, Shayla went back outside and discovered Nathan lying on the ground, grievously wounded by a gunshot to his head.  Despite efforts to save his life, Nathan passed away the next day.

[¶21.]	Relevant to one of the issues in this appeal, Shayla testified outside the presence of the jury regarding Nathan's parole status at the time of his death.[7] Black Cloud's attorney sought to question Shayla regarding Nathan's parole status to impeach her under a theory that Shayla was motivated to "sanitize the version of her story" so that Nathan would not face the consequences of a parole violation. Shayla testified that Nathan was, indeed, on parole at the time of his death relating to a Pennsylvania drug distribution conviction and that he had absconded from parole in 2017 resulting in his extradition back to Pennsylvania where he remained temporarily before returning to Rapid City.

[¶22.]	The State argued that the motive to fabricate a story for the benefit of Nathan was eliminated by his death and that Shayla's initial discussion with police relating the circumstances of the incident were excited utterances.  Black Cloud's attorney responded that Shayla relayed what happened to police before the pronouncement of Nathan's death and that she, thereafter, had an incentive to keep

---

6.	Shayla did not know that Black Cloud had possession of a gun or fired the shots until she was informed by investigators.  She originally thought Johnson fired the shots.

7.	The State filed a pretrial motion in limine to prohibit evidence of Nathan's criminal history or alleged gang affiliation under SDCL 19-19-401, 403.  The circuit court granted the motion, but, as explained below, the court entertained Black Cloud's request at trial to revisit its ruling to allow questioning regarding Nathan's parole status to impeach Shayla's trial testimony.

her version of the events consistent. The circuit court accepted the State's argument regarding the absence of a motive to lie after Nathan's death and otherwise adhered to its pretrial ruling excluding evidence of Nathan's parole status on relevancy grounds.

### *Black Cloud's trial testimony*

[¶23.]	Black Cloud elected to testify and offered his version of the events, which contradicted several details from Shayla's testimony and was generally more supportive of a theory that Black Cloud was acting in the defense of Johnson when he fired the gun.

[¶24.]	At the outset of the altercation, Black Cloud related that Nathan "had an aggressive tone in his voice" and was "angry" when he joined Shayla at the door. Black Cloud claimed Nathan was the first to initiate physical contact by pushing Johnson, and Johnson reacted by grabbing the gun and handing it to Black Cloud. Then Nathan "swung at [Johnson]" "but didn't connect fully . . . [Johnson] . . . kind of ducked and he like kind of skipped over [Johnson]'s head and [Johnson] stepped back into the yard." Johnson swung back, but Nathan dodged it and "kept trying to fight." The pair exchanged pushes as Johnson backed up toward the street and Nathan advanced forward.

[¶25.]	Now in the street, Black Cloud testified that Nathan told Shayla "something to the effect of, Babe, go get my . . . gun." At around this time, Black Cloud said Nathan punched Johnson in the face and Johnson dropped to the ground in the street. Black Cloud then saw Shayla emerge from behind vehicles in the driveway with "something in her hand" but he could not tell what it was because "it

was dark out."[8]  According to Black Cloud, Nathan "said something to the effect of, I got a gun.  I'll shoot all you motherfuckers, or something like that."  Black Cloud testified that Nathan began to walk toward Shayla, and he feared Nathan would obtain a gun from Shayla and shoot Johnson who was positioned about fifteen feet from Nathan.  Black Cloud was standing further down the street and recalled Johnson telling him to "shoot this motherfucker."

[¶26.] Black Cloud raised the gun and fired a warning shot down toward the street and "didn't mean to fire twice, but I guess the recoil and my adrenaline, my – the pressure that I had on my finger, that my finger moved and caused the gun to fire twice."  Black Cloud theorized that the second shot was on plane with the back of Nathan's head because after "I fired towards the ground, boom, it knocks the gun up, boom and boom[.]"  When Black Cloud saw Nathan fall, he and Johnson ran in separate directions.  Two days later, Black Cloud arrived at the Rapid City Police Department where he initially claimed Johnson pulled the trigger but later admitted that he was the one who shot Nathan.  At trial, Black Cloud acknowledged that he initially lied to investigators, and definitively admitted he fired the two shots near where shell casings were found, roughly 69 feet from the spot where Nathan fell to the ground.[9]

---

8. Other than Black Cloud's testimony, there was no evidence that Shayla retrieved a gun or that Nathan was in possession of a gun at any point during the altercation.  First responders found Nathan unarmed with his hand in his pocket.

9. Black Cloud testified that he was stepping backward after the first shot.  However, based upon the placement of the two shell casings, the State's expert opined that Black Cloud stepped forward before firing the second shot.

*Sentencing*

[¶27.]     Though the jury found Black Cloud guilty of second-degree murder, his status as a juvenile offender rendered him ineligible for the mandatory life sentence that would otherwise apply. *See* SDCL 22-6-1 (restricting sentences for juvenile offenders convicted of the most serious offenses to "a term of years"); SDCL 22-6-1.3 ("The penalty of life imprisonment may not be imposed upon any defendant for any offense committed when the defendant was less than eighteen years of age."). The circuit court was aware of the limit upon its sentencing authority and explained at Black Cloud's sentencing hearing that there are "unique factors that have to be considered by the Court in sentencing a 14-year-old."

[¶28.]     Acknowledging the United States Supreme Court's *Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) decision and drawing from our opinion in *State v. Quevedo*, 2020 S.D. 42, 947 N.W.2d 402, the circuit court applied a set of six factors designed to account for an offender's relative youth. *See infra* ¶ 72. Using these *Miller* factors as its guide, the court engaged in a lengthy, individualized analysis of Black Cloud and the circumstances of Nathan's murder, spanning about 18 pages in the sentencing transcript. In what the court described as "the hardest decision this Court has had to make[,]" it stated:

> In fashioning an appropriate sentence, the Court has weighed the *Miller* factors. It has also taken into consideration the fact an innocent man was drawn from his house to protect his home, his wife, and his child. He went unarmed against a spiteful, cowardly, instigating youth by the name of Ross Johnson who would simply not abide by the reasonable request to leave the property. In the end after the altercation was over and Nathan Graham, still unarmed, turned his back to return to his house and continue the quiet night of watching movies with his wife, he was shot and killed by a 14-year-old boy.

...

> The Court is sentencing you to 40 years in the penitentiary with the credit for time served. In weighing the senselessness of this act, the innocence of the victim, and the circumstances overall, as aggravating factors against the mitigating factors the Court has clearly outlined and considered, the Court deems that to be an appropriate sentence.

[¶29.] Black Cloud appeals, asserting the following issues for our review, restated as follows:

1. Whether the circuit court abused its discretion in denying Black Cloud's motion for a mistrial following the voir dire discussion regarding Black Cloud being tried in adult court.

2. Whether comments to the jury regarding Johnson's guilty plea constituted plain error.

3. Whether the circuit court abused its discretion when it refused to instruct the jury to disregard Johnson's guilty plea.

4. Whether the circuit court erred in excluding evidence that Nathan was on parole at the time of his death.

5. Whether the circuit court abused its discretion by imposing a 40-year sentence or erred by imposing a sentence in violation of the Eighth Amendment's prohibition against cruel and unusual punishment.[10]

---

10. Black Cloud also initially asserted that the circuit court abused its discretion by transferring the case from juvenile to adult court. We have held that transfer orders are "not appealable as of right; however, the proceeding will be reviewed following a guilty verdict in the circuit court." *State v. Rurup*, 272 N.W.2d 821, 823 n.1 (S.D. 1978). But the record must contain the separate juvenile file which is often added through an appropriate motion to take judicial notice. Here, the record does not contain the juvenile file, and Black Cloud acknowledged at oral argument that the transfer order issue is not properly before us.

**Analysis and Decision**

*Prosecutor's voir dire reference to the transfer decision*

[¶30.]     Black Cloud argues that the prosecutor committed prosecutorial misconduct when she told the jury that the court—not the State—had decided he should be tried as an adult.  Defense counsel made a prompt objection to the statement, and the circuit court essentially agreed and required further clarification.  The prosecutor complied and explained the State's role in Black Cloud's transfer from juvenile court, without objection.  Following the prosecutor's additional voir dire discussion with the members of the venire, defense counsel made a motion for mistrial, which the court denied.  The parties' arguments tend to view the court's responses during this sequence of events as a single issue amenable to a single standard of review, though they differ on the correct one.

[¶31.]     Black Cloud argues that the issue should be reviewed de novo because the prosecutorial misconduct issue implicates the constitutional right to due process.  But the State claims Black Cloud did not preserve a constitutional claim, and we should utilize the abuse of discretion standard traditionally used to review a court's denial of a mistrial motion.  In our view, the standard of review question is not as difficult as the parties' divergent arguments suggest, mainly because the issue involves *two* separate decisions by the court—the decision to order a clarification and the decision to deny the motion for mistrial.

[¶32.]     The first of these followed defense counsel's timely objection alleging the prosecutor had engaged in deception by suggesting the circuit court acted unilaterally to transfer Black Cloud to adult court.  *See State v. Hankins*, 2022 S.D.

67, ¶ 32, 982 N.W.2d 21, 33 ("Prosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." (quoting *State v. Hayes*, 2014 S.D. 72, ¶ 22, 855 N.W.2d 668, 675)). In her objection, defense counsel specifically stated:

> I think it's an attempt by the State to kind of take some of that feeling of charging a 14-year-old with murder and put it on the Court, which that was ultimately your call, but it was the State who decided to seek that transfer. And to mislead the jury in that way, I think, is inappropriate. *So I would ask that the Court clarify that to the jury. . . .*

(Emphasis added.)

[¶33.]      But there is a more important question—what, if any, claim of error did the timely objection preserve? When prompted by Black Cloud's attorney, the circuit court agreed that the prosecutor's "intentional" effort to skirt the State's critical involvement in Black Cloud's transfer proceeding required clarification because it created the inaccurate impression with members of the venire that the court had acted on its own to order Black Cloud's transfer from juvenile court. After the prosecutor gave a more complete account of Black Cloud's transfer to adult court, she asked, "Is that sufficiently clear, Your Honor?" The court responded, "It is. Thank you." Black Cloud, for his part, offered no further objection or argument concerning the prosecutor's conduct.

[¶34.]      Simply put, Black Cloud prevailed before the circuit court. His objection was timely and appropriate, and the circuit court exercised its discretion to neutralize any error. Therefore, as it relates to the prosecutor's effort to conceal the State's involvement in Black Cloud's transfer proceedings, there is no adverse

order to review. *See Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1277 (Del. 2000) ("As a general rule, the prevailing party may not appeal a decision in its favor.").

[¶35.] Black Cloud's additional claim that the subsequent voir dire discussion created the impression that the circuit court's transfer order was tantamount to a factual finding of guilt reflects a different issue. Black Cloud preserved this claim with a mistrial motion, and because the court denied relief, it presents an appropriate issue for appellate review.

### Mistrial motion following efforts to clarify the juvenile transfer process

[¶36.] Ironically, the State's "post-clarification" discussion with prospective jurors strongly suggested that they were not particularly concerned with the State's involvement in the larger transfer process, which they generally accepted as a part of the law. Members of the venire repeatedly stated that Black Cloud's age would not be a factor in how they assessed the evidence. None of the prospective jurors expressed the view that Black Cloud's transfer to adult court had determined any of the factual issues relating to guilt.

[¶37.] And when one juror asked about the "criteria" for trying a juvenile as an adult, the circuit court intervened and instructed the members of the venire to consider that decision to be a legal determination made by the court that did not impact the role of a juror to determine facts from the evidence:

> The issue about what court this case has ended up in is a jurisdictional question and a question therefore of law rather than fact. And that is why the Court made that decision.
>
> In making that decision, the Court wants to make it very clear that it is not intending to validate or give the impression of any issue of fact, which is the jury's role alone. So the Court takes

> care of legal questions and the jury takes care of factual questions, and don't get those two mixed up.
>
> So ultimately the bottom line is this, we are where we are. You don't have to worry about how we got here because that was a legal question. Legal questions, you don't have to worry about. You do have the role of figuring out factual questions. And when the evidentiary portion of the trial starts, that's what you're all going to be doing.

[¶38.] Black Cloud, however, expressed a different view of the voir dire discussion following the prosecutor's clarification of the State's role in the transfer process. Noting "our efforts to cure the issue[,]" defense counsel expressed the view that, "I don't think we made it better." As a result, defense counsel moved for a mistrial, asserting a concern that the prospective jurors "now think this Court made some sort of determination about the facts about this case."

[¶39.] The court denied the motion. Synthesizing the responses of several jurors, the court noted that jurors generally accepted the idea that a "process" was used to transfer Black Cloud to adult court. Recalling the single question from a prospective juror about the criteria considered in the transfer determination, the court believed that its prompt instruction about the relative responsibilities between the court and the jury had been effective in placing the decision to transfer Black Cloud to adult court in its proper legal context. The court also noted that much of the State's discussion with the venire focused on its effort to ensure the prospective jurors would not acquit Black Cloud solely because of his youth—a topic the court concluded was a permissible subject for voir dire.

[¶40.] We review the circuit court's decision to deny a motion for mistrial for an abuse of discretion and apply our familiar rule that holds a mistrial "will not be

granted unless there is a showing of actual prejudice to the defendant." *State v. Thomas*, 2019 S.D. 1, ¶ 27, 922 N.W.2d 9, 17 (quoting *State v. Johnson*, 2001 S.D. 80, ¶ 9, 630 N.W.2d 79, 82); *see State v. Stone*, 2019 S.D. 18, ¶ 34, 925 N.W.2d 488, 499–500 ("Abuse of discretion is defined as a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which on full consideration, is arbitrary or unreasonable." (cleaned up)).  Here, the court was in the best position to assess the presence of actual prejudice, and we conclude it acted within its discretion.

[¶41.]      Indeed, we perceive no actual prejudice resulting from the post-clarification discussion about trying a juvenile defendant like Black Cloud as an adult.[11]  We instead read the discussion after the State's clarification in much the same way the circuit court described it—the State's legitimate effort to discuss the subject of Black Cloud's age with the prospective jurors.

[¶42.]      We are unable to detect any indication among the responses from these potential jurors that would suggest that they believed the court had already made factual determinations bearing upon Black Cloud's guilt.  In fact, when the court intervened to preempt a venire member's question about the criteria used to determine the transfer issue, the court expressly told the prospective jurors that its decision was not intended "to validate or give the impression of any issue of fact, which is the jury's role alone."  Within the same instruction, the court emphasized,

---

11.    We have held, in this regard, that "[f]or purposes of determining whether there are grounds for a mistrial, there must be error which, in all probability, produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Thomas*, 2019 S.D. 1, ¶ 27, 922 N.W.2d at 17 (cleaned up).

"The decision was made and *has nothing to do with the Court's consideration of how this case should be decided*. I'm 100 percent out of that process. That is your process as jurors." (Emphasis added.)

[¶43.]     We presume that juries follow their instructions, *see State v. Shelton*, 2021 S.D. 22, ¶ 30, 958 N.W.2d 721, 731, and we see no reason to doubt that here. Black Cloud did not demonstrate the existence of actual prejudice, and the circuit court acted within its discretion to deny his motion for mistrial.

***Prosecutor's voir dire reference to Johnson's guilty plea***

[¶44.]     Black Cloud also challenges the prosecutor's reference to Johnson's guilty plea during voir dire and, in particular, the prosecutor's statement that Johnson was charged with the same crime that Black Cloud was facing and had since pled guilty. Black Cloud contends this statement left the jury with the inaccurate impression that Johnson had pled guilty to murder. Black Cloud acknowledges that the error was forfeited by the lack of an objection and has requested plain error review. "To establish plain error, an appellant must show (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *State v. Manning*, 2023 S.D. 7, ¶ 40, 985 N.W.2d 743, 756 (quoting *State v. Bryant*, 2020 S.D. 49, ¶ 19, 948 N.W.2d 333, 338).

[¶45.]     We are not convinced there was any error. In context, the reference to Johnson's guilty plea came at a point in the voir dire when the prosecutor was asking prospective jurors about their attitudes concerning a witness for the State

who had pled guilty and was cooperating pursuant to a plea agreement. This was a legitimate topic of discussion, notwithstanding the fact that the prosecutor incorrectly implied that Johnson had also pled guilty to murder. Information in the record indicates that he, instead, pled guilty to aggravated assault and being an accessory in connection with the events of August 17.

[¶46.] We are unaware of a rule that requires the circuit court to act sua sponte to correct a factual error of this sort. And Black Cloud has not identified any such rule or controlling legal authority that would make the error "clear or obvious." *State v. Guziak*, 2021 S.D. 68, ¶ 16, 968 N.W.2d 196, 201 (quoting *State v. McMillen*, 2019 S.D. 40, ¶ 23, 931 N.W.2d 725, 732) (holding an error is plain when it is "clear and obvious[,]" which "means that lower court decisions that are questionable but not plainly wrong (at time of trial or at time of appeal) fall outside the Rule's scope.").[12]

[¶47.] Black Cloud blends separate, ancillary arguments into his claim that the circuit court committed plain error. Because Johnson ultimately refused to cooperate and did not testify, Black Cloud claims the impact of the prosecutor's reference is enhanced. This, in turn, leads to Black Cloud's assertion that the court

---

12. Black Cloud heavily relies on *State v. Jordan*, 627 S.W.2d 290 (Mo. 1982), but we think the decision is not particularly helpful to our analysis. In *Jordan*, the Missouri Supreme Court applied a type of plain error review to resolve an issue similar to the one we face here, but, critically, the court cited established Missouri decisional law as a definitive rule prohibiting disclosure of the disposition of a co-defendant's case. 627 S.W.2d at 293. Black Cloud has identified no such binding rule in South Dakota, and we are unaware of one.

should have granted the defense's request to instruct the jury that it could not consider Johnson's guilty plea as evidence of Black Cloud's guilt.

[¶48.]     Viewed as a component of the plain error argument, Black Cloud's additional claim regarding the impact of Johnson not testifying is unsustainable. The fact that Johnson did not testify and the circuit court's refusal of Black Cloud's instruction evoke concepts of prejudice—i.e. the impact of the prosecutor's statement regarding Johnson's guilty plea became worse by virtue of subsequent events. But this type of prejudice claim does not correspond with the sequential application of our well-settled plain error test.

[¶49.]     Though the third prong of the test implicates harmlessness or prejudice, we reach it only if the first two prongs are satisfied. Here, as we have held, they are not. In other words, before we could assess whether an error that was plain had an impact upon a defendant's substantial rights, we must, of course, first find the existence of the predicate plain error.

### *Jury instruction to disregard Johnson's guilty plea*

[¶50.]     Nevertheless, we are able to review Black Cloud's claim that the circuit court should have instructed the jury not to consider Johnson's guilty plea when determining Black Cloud's guilt as a freestanding issue. Our standard of review for this discrete issue is well-settled:

> A trial court has discretion in the wording and arrangement of its jury instructions, and therefore we generally review a trial court's decision to grant or deny a particular instruction under the abuse of discretion standard. However, when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo. Under this de novo standard, we construe jury instructions as a whole to learn if they provided a full and correct statement of the law.

*State v. Schumacher*, 2021 S.D. 16, ¶ 25, 956 N.W.2d 427, 433–34 (cleaned up).

[¶51.]     Because Johnson refused to testify, Black Cloud argues he did not have the opportunity to clarify that Johnson did not plead guilty to murder, leading him to propose the following instruction:

> You have heard evidence that witness Ross Johnson has pleaded guilty to a crime which arose out of the same events for which the Defendant is on trial here. That guilty plea cannot be considered by you as any evidence of this Defendant's guilt. The witness' guilty plea can be considered by you only for the purpose of determining how much, if at all, to rely on that witness' testimony.

[¶52.]     The circuit court refused the instruction, citing the fact that it referred to Johnson as a witness. It may well be that granting the defense's request to give a revised version of its proposed instruction would have been a sound exercise of the court's discretion. But our inquiry is broader than simply considering the proposed instruction alone and takes into account the circuit court's instructions as a whole. Under this more comprehensive review, we cannot find an abuse of discretion.

[¶53.]     The prosecutor's remarks about Johnson's guilty plea came during voir dire in a context that was not related to Black Cloud's guilt and well before the evidentiary portion of the trial commenced. Further, the circuit court instructed the jury that the statements of counsel are not evidence, and viewed in their entirety, the instructions correctly stated the applicable law.

[¶54.]     And though it is not necessary to address Black Cloud's claims of prejudice, given our determination that there was no abuse of discretion, we note that the absence of Johnson's testimony or the proposed instruction would not meet the standard of prejudice warranting a reversal. Frankly, it seems like Johnson's

refusal to testify would have more of an adverse impact on the State's case than Black Cloud's. The State had, after all, told the jury that Johnson would testify. If the idea was that Johnson would assist with the State's effort to prove the lack of justification, it never came to pass, which we would tend to view as favorable to Black Cloud.

[¶55.] Regardless, Johnson's guilty plea was a small part of the trial. There is no claim that the prosecutor knew Johnson would not cooperate when she referenced his plea, and what little the jury did hear during the trial came from a police detective whose testimony supported the idea that Johnson did not plead guilty to murder and was, instead, allowed to plead guilty to less serious charges.

*Nathan's parole status*

[¶56.] On appeal, Black Cloud asserts that excluding evidence of Nathan's parole status deprived him of his constitutional right to present a complete defense that shooting Nathan was justified by the need to defend Johnson. Though Black Cloud objected to the exclusion of evidence concerning Nathan's parole status before the court, he did not claim that the evidence was necessary to vindicate his constitutional right to present a complete defense. But preserved or not, we do not believe the exercise of the circuit court's discretion contravened Black Cloud's right to present a complete defense.[13]

---

13. The United States Supreme Court has recognized a class of cases in which an evidentiary ruling can operate to deprive a defendant of the right to present a complete defense if the evidentiary rule infringes upon a "'weighty interest of the accused' and is 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *Holmes v. South Carolina*, 547 U.S. 319, 324, 126 S. Ct. 1727, 1731, 164 L. Ed. 2d 503 (2006) (quoting *United States v. Scheffer*, 523

(continued . . .)

[¶57.]     Prior to trial, the circuit court granted the State's motion in limine to exclude evidence regarding Nathan's criminal history, which would relate to his parole status, on the basis of relevancy. The overarching context for the parties' arguments and the court's ruling centered on the fact that Black Cloud could not have considered Nathan's criminal history as part of his asserted justification for the shooting because Black Cloud did not know about Nathan's criminal history.

[¶58.]     The argument changed at trial when Black Cloud argued for the first time that evidence of Nathan's parole status was necessary to impeach Shayla, who Black Cloud claimed had initially lied to police by telling them that Nathan had not assaulted Johnson. Though he described the effort to inquire into Nathan's parole status at trial as impeachment, Black Cloud did not claim the ability to cross-examine Shayla on this point implicated his Sixth Amendment right of confrontation. And though he has argued on appeal that the circuit court's ruling deprived him of his constitutional right to present a complete defense, as indicated above, Black Cloud has not specifically claimed that the court's ruling violated his right of confrontation.

---

(. . . continued)

U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413). More commonly, "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . ., only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane v. Kentucky*, 476 U.S. 683, 689–90, 106 S. Ct. 2142, 2146, 90 L. Ed. 2d 636 (1986) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986)). We regard this case as one fitting within this latter, more typical category because, as we explain below, the circuit court's decision to exclude evidence of Nathan's parole status was not "central to [Black Cloud's] claim of innocence." *Id.* at 2147.

[¶59.] Rather, Black Cloud continues to view the issue as one based on concepts of evidentiary relevance. He argues that the parole status information was legally relevant under SDCL 19-19-401 (Rule 401), and he is entitled to relief on appeal because the circuit court did not balance the proffered evidence under SDCL 19-19-403 (Rule 403). We view the issue differently.

[¶60.] Even if the evidence of Nathan's parole status had some legal relevance under Rule 401,[14] the fact that the circuit court did not conduct a Rule 403 balancing on the record is not necessarily fatal.[15] *See State v. Scott*, 2013 S.D. 31, ¶ 28, 829 N.W.2d 458, 468 (holding that conducting a Rule 403 balancing analysis on the record assists with appellate review but is not "explicitly require[d]" by the rule). Balancing under Rule 403, as *Scott* indicates, is best conducted on the record in order to enhance appellate review, but the absence of the balancing, though suboptimal, does not categorically preclude appellate review where we are able to meaningfully assess the exercise of the circuit court's discretion. Here, the attenuated nature of Black Cloud's impeachment theory and the lengthy discussions among counsel for the parties and the court make clear that the circuit

---

14. Evidence is relevant if:

> (a) It has any tendency to make a fact more or less probable than it would be without the evidence; and
> (b) The fact is of consequence in determining the action.

SDCL 19-19-401.

15. A trial court balances evidence under Rule 403 when it determines "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."

court acted within the range of permissible choices when it denied Black Cloud's request to cross-examine Shayla about Nathan's parole status.

[¶61.]     Black Cloud's theory is that Shayla had lied to police officers at the scene of the shooting to cover up Nathan's alleged assault upon Johnson in order to avoid extradition for a potential violation of his Pennsylvania parole conditions.  In Black Cloud's view, Shayla's incentive to lie during her trial testimony remained, despite Nathan's death, if only to maintain consistency.  But this theory lacks an important predicate at the outset—Shayla's initial statement to the police was never introduced as evidence.

[¶62.]     Shayla's statement was made to a police officer shortly after the shooting and was captured by the officer's body-worn recording equipment.  Black Cloud objected to the State's effort to introduce the recording, arguing that Shayla's statements, which were offered before she testified, were inadmissible hearsay.  The circuit court agreed and excluded those portions of the video, rejecting the State's argument that Shayla's statements about the incident were admissible as her present sense impression or as excited utterances.  *See* SDCL 19-19-803(1)-(2).

[¶63.]     Consequently, in order to impeach Shayla's motive for testifying as she did at trial—i.e. Nathan did not assault Johnson—Black Cloud would have had to set the context by referencing Shayla's initial statement to police, excluded at his request, and first impeach that out-of-court statement in order to then try to impeach her trial testimony as merely consistent with the initial statement to police.  Before the circuit court, the State argued that the proposal was "a stretch" which we interpret to mean too weak and attenuated.  We agree, and the record

indicates the court did too, at least in part. The court detailed the winding course of Black Cloud's impeachment theory and concluded it was "improper."

[¶64.]        Finally, we note that the inability to ask Shayla about Nathan's parole status did not in any way impact Black Cloud's abilty to impeach Shayla in precisely the way proposed. Nathan's parole status was unnecessary to develop the argument that Shayla was motivated to lie to police officers to conceal her husband's allegedly assaultive conduct toward Johnson. Committing an assault upon a minor would be as likely to justify a criminal charge in South Dakota as it would a parole revocation and extradition to Pennsylvania, perhaps more so.[16] And Black Cloud could have, but did not, seek to impeach Shayla by suggesting that she was motivated to conceal criminal assaultive conduct generally.

### *Black Cloud's sentence*

[¶65.]        A circuit court's sentencing decision is generally reviewed for an abuse of discretion. *State v. Klinetobe*, 2021 S.D. 24, ¶ 26, 958 N.W.2d 734, 740. But when a defendant argues his sentence "violates the Eighth Amendment's proscription against cruel or unusual punishment[,]" our review is de novo. *Id.* Black Cloud asserts both arguments which we address in turn.

---

16.    The fact that Nathan had previously been extradited to Pennsylvania as part of his parole supervision is not as central to Black Cloud's argument as he suggests. Shayla explained that Nathan was extradited because he had moved before this supervision was transferred to South Dakota. As a result, he was returned to Pennsylvania, but not to prison; he remained at a detention center for a few months until his supervision was officially transferred to South Dakota, at which point he was allowed to return to Rapid City.

[¶66.]     "Sentencing courts possess broad discretion within constitutional and statutory limits to determine the extent and kind of punishment to be imposed." *State v. Mitchell*, 2021 S.D. 48, ¶ 28, 963 N.W.2d 326, 333 (quoting *State v. Rice*, 2016 S.D. 18, ¶ 23, 877 N.W.2d 75, 83) (cleaned up).  The circuit court should weigh, on a case-by-case basis, the traditional sentencing factors of retribution, deterrence, rehabilitation, and incapacitation without giving any particular factor preeminence and also taking into account mitigating and aggravating factors.  *Id.* ¶¶ 28–30.

[¶67.]     Further, a sentencing court should consider both the defendant appearing before it as well as "the nature and impact of the offense."  *Id.* ¶ 29.  We have held, in this regard, that "the sentencing court should acquire a thorough acquaintance with the character and history" of the defendant by studying the "defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record."  *Id.* (citations omitted).

[¶68.]     Here, the circuit court did not abuse its discretion.  The court presided over the case from the time it was a juvenile proceeding through the sentencing hearing.  It had the benefit of direct familiarity with the evidence in the case and a detailed pre-sentencing investigation report.  We are convinced the circuit court developed a thorough understanding of Black Cloud's background and conduct.  Among its reflections, the court extensively considered Black Cloud's young age, family support, homelessness, and substance abuse.

[¶69.]     The circuit court also considered the "nature and impact of the offense."  Not only did Black Cloud engage in deadly behavior, but the court noted it

was completely unnecessary and final. Black Cloud senselessly killed Nathan, resulting not only in the loss of his life, but also leaving a profound impact on Nathan's family.

[¶70.] Black Cloud argues that the circuit court did not account for Black Cloud's youth in fashioning the sentence and that Johnson's sentence of 20 years is comparatively lenient and indicative of an abuse of the court's sentencing discretion. Regarding his first argument, Black Cloud's youth was unquestionably contemplated because, as we explain below, the circuit court considered factors from the United States Supreme Court's *Miller* decision that are specifically designed to account for an offender's youth. Beyond this, the court at multiple points expressly referenced Black Cloud's youth.

[¶71.] And comparing Johnson's sentence to Black Cloud's is not helpful because Black Cloud has not demonstrated they are similarly situated. *Klinetobe*, 2021 S.D. 24, ¶ 39, 958 N.W.2d at 743 ("A claim of unwarranted sentencing disparity depends upon a record that establishes that co-defendants were similarly situated and *inexplicably* received different sentences." (emphasis added)). Johnson's sentencing record is not part of the record in this appeal, and all that is known is that he pled guilty to a reduced charge.

[¶72.] Nor do we believe Black Cloud's sentence violated the constitution. The Eighth Amendment prohibits "extreme sentences that are 'grossly disproportionate to the crime.'" *Quevedo*, 2020 S.D. 42, ¶ 37, 947 N.W.2d at 410 (quoting *State v. Diaz*, 2016 S.D. 78, ¶ 51, 887 N.W.2d 751, 766). Though a second-degree murder conviction typically carries a mandatory life sentence, *see* SDCL 22-

6-1, the Eighth Amendment categorically prohibits this type of mandatory sentence for juvenile offenders who commit homicides, like Black Cloud. *Miller*, 567 U.S. at 489, 132 S. Ct. at 2475; *Quevedo*, 2020 S.D. 42, ¶ 20, 947 N.W.2d at 406; *see also* SDCL 22-6-1.3 (prohibiting life sentences for any offense "when the defendant was less than eighteen years of age.").

[¶73.] In *Miller*, the Supreme Court held that sentencing courts should account for a juvenile homicide offender's youth by considering six factors:

> (1) the chronological age of the juvenile, (2) the juvenile's immaturity, impetuosity, irresponsibility, and recklessness, (3) family and home environment, (4) incompetency in dealing with law enforcement and the adult criminal justice system, (5) the circumstances of the crime, and, most importantly, (6) the possibility for rehabilitation.

567 U.S. at 489, 132 S. Ct. at 2475.

[¶74.] Here, the circuit court applied the *Miller* factors. The court noted that Black Cloud's youth rendered him susceptible to Johnson's influence. The court also stated that it believed Black Cloud "did consider the consequences of his actions but not in the way that an adult would . . . in his immature juvenile mind[,] [h]e would have increased status[,] . . . sense of self-importance[,] . . . [and] sense of expression . . . when he pulled the trigger . . . due to his age, his immaturity."

[¶75.] In addition to a command to consider unique aspects of youth when sentencing a juvenile homicide offender, sentencing courts must also adhere to a more universal Eighth Amendment principle that prohibits sentences that are grossly disproportionate to the offense. Here, we conclude that Black Cloud's sentence does not violate this standard.

[¶76.] We determine gross disproportionality by comparing the "gravity of the offense against the harshness of the penalty." *Quevedo*, 2020 S.D. 42, ¶ 37, 947 N.W.2d at 410 (quoting *Diaz*, 2016 S.D. 78, ¶ 51, 887 N.W.2d at 766). This case, like our decision in *Quevedo*, involves a juvenile homicide offender convicted of second-degree murder—criminal conduct that unquestionably "ranks high in its 'relative position on the spectrum of all criminality.'" *Id.* ¶ 38, 947 N.W.2d at 411 (citation omitted).

[¶77.] As for our assessment of the penalty's relative harshness, we consider its "position on the spectrum of permitted punishments[.]" *Id.* ¶ 39 (quoting *Diaz*, 2016 S.D. 78, ¶ 54, 887 N.W.2d at 767). As part of this determination, we may consider an offender's eligibility for parole. *Id.*

[¶78.] Black Cloud's 40-year sentence leaves him eligible for parole at age 34. This will allow him a realistic opportunity to live life outside of confinement while he is still a young man. Though any sentence of confinement is, by its nature, grave and sobering, Black Cloud's sentence cannot be described as grossly disproportionate to his crime.

[¶79.] Much of Black Cloud's proportionality argument consists of an effort to compare his sentence to Johnson's punishment and the sentences of other juvenile homicide offenders discussed in our reported decisions. But this argument overlooks the fact that we would engage in a proportionality analysis only if we had determined Black Cloud's sentence to be grossly disproportionate. *See id.* ¶ 37, 947 N.W.2d at 410 ("Only if this threshold inquiry reveals gross disproportionality will

we compare [the defendant's] sentence to other sentences imposed on juveniles convicted of second-degree murder.").

## Conclusion

[¶80.]     We have considered the multiple issues identified in this appeal, and our resolution of each leads us to affirm Black Cloud's conviction and sentence in all respects.

[¶81.]     JENSEN, Chief Justice, and KERN, DEVANEY, and MYREN, Justices, concur.